In re NICOLE GAS PRODUCTION, LTD., Debtor.

No. 09–52887.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division at Columbus.

Signed Sept. 26, 2014.

Brenda K. Bowers, Frederick L. Ransier, Columbus, OH, for Trustee.

*MEMORANDUM OPINION AND ORDER (A) APPROVING CHAPTER 7 TRUSTEE'S SECOND MOTION FOR ORDER AUTHORIZING AND APPROVING LIQUIDATION AND COMPROMISE OF CERTAIN CLAIMS AGAINST COLUMBIA GAS TRANSMISSION CORPORATION AND (B) ENJOINING THE PURSUIT OF CLAIMS BELONGING TO THE DEBTOR'S ESTATE*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

Frederick Ransier, the Chapter 7 trustee of the bankruptcy estate of Nicole Gas Production, Ltd.—or NGP—seeks authority to settle NGP's claims against Columbia Gas Transmission Corporation (now known as Columbia Gas Transmission, LLC) and three of its affiliates. Before his death, NGP's founder, Freddie Fulson, opposed the settlement and then commenced a state court lawsuit against the Columbia Gas entities in violation of the Bankruptcy Code, with the aid of attorney Robert Sanders, who also opposed the settlement. This contested matter presents two questions: (1) Should the settlement be approved? (2) If so, should the state court

lawsuit be enjoined? Because the settlement is fair and equitable and within the range of reasonableness, the Court must approve it. And because the state court claims that are based on damages sustained by NGP are property of NGP's bankruptcy estate and are being settled by Ransier, the Court enjoins all entities from asserting those claims as well any others belonging to NGP's estate.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

■ The Court also must evaluate whether it has the constitutional authority to enter a final order in this contested matter after *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") and, in connection with approving the settlements, to enjoin third parties from pursuing claims that are property of a debtor's estate. *See Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),* 740 F.3d 81, 95 (2d Cir.2014) ("[T]he Bankruptcy Court's authority under the Bankruptcy Code to approve the settlement between the Trustee and the Picower defendants and to permanently enjoin appellants' disguised fraudulent transfer claims does not run afoul of Article III of the United States Constitution."); *In re Ambac Fin. Grp., Inc.,* 457 B.R. 299, 308 (Bankr.S.D.N.Y.2011) ("Whatever *Stern v. Marshall* may ultimately be held to mean, this Court is confident that, as a matter of law and practice, it most certainly does not stand for the proposition that the bankruptcy court cannot approve the compromise and settlement of a claim which is indisputably property of a debtor's estate.").

## III. Procedural Background

Before the Court is Ransier's second motion ("Motion") (Doc. 104) under Bankruptcy Rule 9019(a) requesting that the Court authorize him to accept a $250,000 cash payment in exchange for releasing any claims NGP has or may have against Columbia Gas Transmission Corporation ("TCO") and its affiliated entities, including Columbia Gas of Ohio, Inc.; Columbia Gas of Pennsylvania, Inc. and Columbia Gas of Kentucky, Inc. (together with TCO, "Columbia Gas Entities"). Fulson filed an objection to the Motion ("Fulson Objection") (Doc. 111), as did Sanders ("Sanders Objection") (Doc. 112), who represented Fulson in the state court lawsuit and also holds a small claim against NGP's estate for legal services he provided before its bankruptcy, providing him standing to object to the settlement. After those objections were filed, Fulson and two of his attorneys—Sanders as well as another attorney, James Lowe—filed a complaint ("Complaint") asserting claims ("Ohio RICO Claims") under the Ohio Corrupt Practices Act ("OCPA"),[1] thereby commencing the state court lawsuit against the Columbia Gas Entities ("2013 State Court Case").

Ransier filed a reply (Doc. 118) supporting the Motion, and the Court thereafter held a hearing on the Motion and the Fulson and Sanders Objections. During the hearing, the Court admitted into evidence Ransier's Exhibit 1, as well as exhibits offered by Sanders. *See* Doc. 114

---

1. Codified at sections 2923.31–2923.36 of the Ohio Revised Code, the OCPA is Ohio's version of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

("Sanders Exhibits"). In addition, Ransier and Sanders stipulated that in evaluating whether the Motion should be approved, the Court may consider all evidence admitted during the hearing on the asset purchase agreement ("APA") and settlement it previously approved in the bankruptcy case of NGP's affiliate, Nicole Energy Services, Inc. ("NES"), *see In re Nicole Energy Servs., Inc.*, 385 B.R. 201 (Bankr. S.D.Ohio 2008) (*"Nicole I"*), a case in which Larry McClatchey served as the Chapter 11 trustee (Case No. 03–67484). *See* Hearing Transcript ("Tr."), Doc. 192, at 8–9. Ransier testified in support of the Motion, and Fulson testified in order to provide information in response to questions posed by the Court.

While permitted to testify, Fulson lacked standing to prosecute his own objection for two reasons. First, having withdrawn his proof of claim, Fulson, unlike Sanders, was not a creditor of NGP. *See* Doc. 165 (agreed order withdrawing Fulson's proof of claim). Second, under a best case scenario no distributions from the bankruptcy estate of NGP will be made to its equity owner. And Fulson was not the equity owner of NGP in any event. The Complaint identified Nicole Gas Marketing, Inc. ("NGM") as NGP's sole owner, while the schedules filed in NGP's case (Doc. 28), as well as a document filed by Sanders and Lowe (Doc. 184 at 10 n. 2), identified yet another Fulson-affiliated entity, Nicole Energy Marketing, Inc. ("NEM"), as the sole shareholder. Furthermore, Ransier—who in addition to serving as the trustee of NGP's estate also is the Chapter 7 trustee of the bankruptcy estates of NGM and NEM—already settled any and all claims, including derivative claims, NGM and NEM had against the Columbia Gas Entities. Indeed, the Court approved these settlements by orders that became final and non-appealable before Fulson commenced the 2013 State Court

Case. *See* Order, Doc. 90 in Case No. 09–52884; Order, Doc. 68 in Case No. 09–52885. In short, because he was neither a creditor nor equity holder of NGP, and because the actual equity holder—either NEM or NGM—settled its claims against the Columbia Gas Entities, Fulson had no standing to object to the Motion.

But even if Fulson had standing to prosecute the Fulson Objection, doing so would have been unavailing. Otherwise impenetrable, the Fulson Objection stated in no uncertain terms that Ransier was a "fraud and a liar" and that McClatchey was a "liar[,]" Fulson Objection at 1, 3, rehashing allegations he had previously made in the NGP and NES cases. No evidence supporting the allegations as to McClatchey existed in the NES case. *See Nicole I*, 385 B.R. at 217, 219 & n. 13. And if Sanders saw any factual basis for Fulson's allegations as to Ransier, he could have attempted to put evidence on to prove them. But he failed to do so—no doubt because there was no such evidence to be adduced. In fact, the day before he presented the Sanders Objection, Sanders testified during the hearing on Ransier's motion to hold him in contempt for pursuing the 2013 State Court Case ("Contempt Motion") (Doc. 119) that "I don't fault Mr. Ransier or, for that matter, Mr. McClatchey in either of these two related Nicole cases" and "I have no quarrel with them nor does Mr. Fulson have any quarrel with their function as a trustee." Doc. 175 at 80. In addition, during the hearing on the Contempt Motion and the Court's order to show cause why Sanders, Fulson and Lowe should not be held in contempt (Doc. 137), Sanders essentially conceded that the settlement should be approved: "[W]e are not saying that the approval of the ... settlement—is wrong. In other words, the procedure by which the Court has approved it, the trustee is acting responsibly,

the Court is acting responsibly." Doc. 175 at 80.

Still, he prosecuted the Sanders Objection the very next day during the hearing on the Motion. He did not initially call Fulson to testify, instead doing so only in response to certain questions the Court posed, and the only documentary evidence he introduced supported the settlement even when construed in his favor (more on this below). Sanders's prosecution of his objection was perfunctory at best, suggesting that he saw it as merely a step to be taken on his way back—or so he hoped—to state court.

During the hearing on the Motion, counsel for TCO stated that it would pay the settlement amount only if the Court enjoined the pursuit of derivative claims and other claims belonging to NGP's estate, citing the pendency of the 2013 State Court Case as justification for the injunction. Because the claims asserted in the 2013 State Court Case were derivative and thus property of NGP's estate, Ransier supported the injunction.

After the hearing, the Court entered an Order (A) Providing Notice of Proposed Injunction and (B) Establishing Briefing Schedule on the Issue of the Appropriateness of the Injunction ("Injunction Notice") (Doc. 169), describing the proposed injunction in such a way that it covered the claims asserted in the 2013 State Court Case to the extent they were determined to be derivative of claims of NGP:

> [T]he Court intends—if it approves the Motion—to permanently enjoin all entities from pursuing claims that are property of NGP's estate, including, without limitation, claims that are derivative of those belonging to NGP's estate. The claims enjoined would include the claims asserted in the pending lawsuit against TCO and affiliated entities filed by Freddie Fulson (through his attorneys Robert Sanders and James Lowe) in the Court of Common Pleas of Franklin County, Ohio, Case No. 13CVH–972, to the extent that the claims asserted in that lawsuit are determined to be derivative of claims of NGP or are otherwise determined to be property of NGP's bankruptcy estate, as well as any such claims that might be asserted in the future.

Injunction Notice at 2.

The Injunction Notice also provided an opportunity to support or oppose the injunction. Ransier filed a brief in support (Doc. 177), Sanders and Lowe a brief in opposition ("Injunction Response") (Doc. 184), and Ransier a supporting reply brief (Doc. 186). TCO also filed a brief in support of the proposed injunction (Doc. 179). Lowe and Sanders filed a motion to strike that brief because it was filed one day after the deadline established by the Court (Doc. 180), and TCO then filed a motion for leave to file its brief late (Doc. 181). Because TCO's brief merely adopted the arguments made in Ransier's and reiterated the statements TCO's counsel made during the hearing on the Motion, the Court need not consider TCO's brief in order to decide this matter, and the dueling motions by Lowe and Sanders and TCO are denied as moot.

A document was later filed informing the Court and parties in interest of Fulson's death (Doc. 188). On August 6, 2014, Lowe filed a notice (Doc. 190) stating that Fulson's estate had been substituted as the plaintiff in the 2013 State Court Case.

Along with this opinion, the Court is contemporaneously issuing an opinion holding that Fulson, Sanders and Lowe violated the automatic stay by bringing the 2013 State Court Case, because the Ohio RICO Claims that are based on damages sustained by NGP ("NGP Ohio RICO

Claims") are derivative of NGP's claims and are property of NGP's bankruptcy estate.[2]

### IV. Background

Consistent with Ransier's and Sanders's stipulation that the Court may take into account the evidence admitted during the hearing on the APA in evaluating whether the Motion should be approved, the Court has considered the evidence adduced at both hearings. As that evidence shows, given the possible litigation outcomes for NGP, the $250,000 settlement amount is proportionate to the value provided NES's estate under the APA and is well within the range of reasonableness.

### A. NGP's and NES's Contractual Relationship with the Columbia Gas Entities

TCO owns and operates an interstate natural gas pipeline system in multiple states, and the other Columbia Gas Entities own and operate local distribution systems in certain of those states. In the mid–1990s, independent gas companies obtained access to the systems. In order to take advantage of the opportunities afforded by this access, Fulson formed NGP to purchase gas wells and NES to sell gas from those wells to its customers. In 1999, NGP borrowed $1,332,800 on a short-term basis from RAG PLHC ("RAG") in order to purchase 138 gas-producing wells in Pennsylvania and West Virginia. The loan agreement was dated March 10, 2000 and required NGP to pay back the full amount just a little over a month later, on April 17, 2000. NGP was unable to pay back the loan within that time frame, and in June 2000 RAG filed a complaint for the amount due.

Despite the default, NGP and NES operated for a while longer. Unable to transport and distribute natural gas itself, NGP would sell it to NES, which had entered into agreements under which TCO would transport gas on TCO's lines, and the other Columbia Gas Entities would distribute the gas to NES's customers. In mid–2001, the Columbia Gas Entities commenced a lawsuit ("2001 State Court Case") in the Court of Common Pleas of Franklin County, Ohio ("State Court") alleging, among other things, that NES injected into the system a lesser amount of gas than the Columbia Gas Entities delivered to NES's customers; that it had defaulted on its obligation to pay gas transportation charges to TCO; and that it had made, along with Fulson and his other entities, certain fraudulent transfers. In response, NES filed a third-party complaint for, among other things, breach of contract and negligence. NES alleged that the Columbia Gas Entities under-credited NES for the amount of gas injected by NGP into the system and had caused NES damages in the tens of millions of dollars, allegedly resulting from three failures on TCO's part: improperly maintaining its gas lines, failing to install meters on certain wells and locating meters it did install too distant from the wells to be accurate. The under-crediting allegedly occurred from December 1, 1999 through August 31, 2002, a period of approximately 33 months. The product of multiplying the number of wells then in operation (138) by the number of months of the alleged under-crediting (33) is 4,554 well-months ("NES Well–Months").

By failing to repay its loan to RAG, NGP eventually lost all but 12 of its wells.[3]

---

2. The Court will address the Ohio RICO Claims that are based on damages sustained by NES ("NES Ohio RICO Claims") by sepa-

rate order on the motions pending in the NES case.

3. While Fulson testified that the number of remaining wells was 10, Tr. at 65, the Motion

"[T]he less-than-favorable financing terms with RAG resulted in a rapid dissipation of NGP's production capacity due to the loss of wells following its default on the bridge loan." *Nicole I*, 385 B.R. at 245. As a result, NES ceased operations in 2002. Afterward, NGP continued to sell natural gas from the remaining 12 wells under an agreement that permitted NGP to use the transportation capabilities of TCO ("NGP Agreement"). According to Ransier, the NGP Agreement was in place from August 5, 2003 through January 28, 2004 and from February 1, 2004 through June 18, 2004, a period of approximately 10½ months. Mot. ¶ 27, 29; Tr. at 27.

For his part, Sanders took the position that the NGP Agreement was in force from September 1, 2002 through June 19, 2004, with the exception of a two-month lapse, for a total of approximately 20 months. As support for this position, he relied on a cover letter from TCO attaching a copy of the agreement for Fulson's signature stating: "Faxed for your review and execution is the above noted Agreement effective August 5, 2003. This agreement is intended to cover the production period beginning September 2002 forward." Sanders Ex. 2. The cover letter references the August 5, 2003 date, as does the NGP Agreement itself, which says that it is effective August 5, 2003 and that the term begins August 5, 2003, a date that supports Ransier's view that the contract period was approximately 10½ months.[4] By contrast, if September 1, 2002 were the correct start date for the contract term, it would support Sanders's position that the contract period was approximately 20

months long. If the matter went to trial, the finder of fact might well conclude that the NGP Agreement's term was 10½ months. But giving Sanders the benefit of the doubt, the Court will assume the contract period spanned the entire 20 months. The product of multiplying the number of wells then in operation (12) by the number of months of NGP Agreement's assumed term (20) is 240 well-months ("NGP Well-Months").

## B. The Settlement Effectuated by the APA

NGP sold its remaining wells and ceased operations in 2004. That same year, NES became a voluntary Chapter 11 debtor following the Columbia Gas Entities' filing of an involuntary Chapter 7 petition against NES and several months of legal wrangling, including a dispute between the parties over the removal of the 2001 State Court Case to this Court. After NES became a voluntary Chapter 11 debtor, the Columbia Gas Entities filed a motion seeking the appointment of a Chapter 11 trustee, and NES ultimately consented to the relief requested. McClatchey was appointed as the Chapter 11 trustee of NES's estate by the United States Trustee, and his appointment was approved by the Court. He filed a motion to employ Sanders as special counsel to prosecute NES's third-party complaint in the 2001 State Court Case on a contingency fee basis—just as Sanders had done before NES's bankruptcy—and the Court approved the motion.

---

assumed the number of remaining wells was 12, a number that gives the benefit of the doubt to Sanders and the number the Court will use in its analysis.

4. During the hearing, Sanders asked Ransier whether he recalled "there being a statement

in there, in your first motion to compromise, that the reason the [$250,000] amount was reached was because there was no contractual claim." Tr. at 49. Ransier did not recall, but as it turns out the Initial Motion said nothing of the sort.

In 2005, McClatchey filed a motion to remand NES's third-party complaint for breach of contract and negligence back to the State Court, a motion the Court granted. After remand, NES filed a motion for partial summary judgment in its favor based on TCO's failure to abide by the terms of the natural gas tariff ("Tariff") that was incorporated by reference into the contract between NES and TCO. The State Court granted the motion, finding that the Tariff required TCO to install equipment to measure the gas injected into its pipeline and that TCO had not satisfied this requirement.

Before the State Court decided the damages issue, the Columbia Gas Entities and McClatchey on behalf of NES agreed that TCO would purchase all of NES's claims against the Columbia Gas Entities, including those asserted in the 2001 State Court Case, pursuant to the APA.[5] McClatchey filed a motion ("NES Sale Motion"), *see* Case No. 03–67484, Doc. 286, requesting that the Court enter an order authorizing and approving the sale. Fulson filed an objection to the NES Sale Motion. So too did Sanders on the basis of the calculation of his contingency fee—an objection resolved when McClatchey agreed to pay him $900,000 plus one-third of the amount of expenses TCO agreed to pay. *Nicole I,* 385 B.R. at 217 n. 10.

The Court conducted a three-day hearing on the NES Sale Motion. In objecting to the sale, Fulson relied on a report claiming that NES had sustained damages exceeding $36 million ("Damages Report"), an amount significantly more than the sale would bring. But McClatchey identified several "questionable assumptions underlying the Damages Report." *Nicole I,* 385 B.R. at 253. He reviewed "all the information that was made available to him[,]" including information provided by an expert, Dr. Richard A. Riley, Jr., who saw a "high probability that [NES] would not be able to sustain its burden of proof on the causal connection between the under-crediting, if there as any, and damages of the magnitude" sought by NES. *Id.* at 240 (internal quotation marks omitted). Among other things, Riley considered "NGP's rapid loss of the wells ... following its default under the bridge financing arrangement with RAG." *Id.* at 253. Furthermore, Riley provided persuasive expert testimony raising "serious doubt as to whether NES and its related entities were financially viable and could operate as going concerns in a manner sufficient to support the damage figures contained in the Damages Report." *Id.* at 243.

While Sanders testified that NES likely would be successful at trial, his statements amounted to little more than "sweeping and optimistic conclusions that have little, if any, support in the record or in the law"—statements such as "[j]uries don't like utility companies." *Id.* at 251.[6] And Sanders "exhibited a significant level of personal hostility toward TCO," which, when combined with his other testimony, left the Court with the impression that he

---

5. A later motion to amend the purchase agreement carved out from the APA "NES's claims ... in *Stand Energy Corporation v. Columbia Gas Transmission Corporation,* Kanawha County, West Virginia Circuit Court ... [a] putative class action...." *Nicole I,* 385 B.R. at 215.

6. During the hearing on approval of the APA, Sanders also testified that when "I can stand before a jury of ordinary people and say you've got this big corporation that gave this man no credit, zero, for two years, then I think I get a jury verdict[,]" and that "I've got an old fedora at home and I'll eat it if I don't get a jury verdict[,]" essentially expressing an "unequivocal opinion that the trial of NES's claims in State Court would result in nothing less than a complete victory" on its alleged $36 million claim. *Nicole I,* 385 B.R. at 252.

lacked "the level of emotional detachment necessary to provide a clear-eyed, dispassionate assessment of the strengths and weaknesses of NES's case against TCO and, ultimately, its probable success at trial." *Id.* at 253. McClatchey also concluded that while "a judgment against TCO would be collectable, TCO's superior financial resources would ensure a lengthy appeal process and cause substantial delay." *Id.* at 254. Following the hearing, the Court issued an opinion approving the APA, concluding it was "highly improbable" that NES would "obtain a monetary judgment, the net present value of which would meaningfully exceed the amount of the proposed settlement[.]" *Id.* at 239.

In addition to the $2.7 million up-front cash payment, the settlement value realized by the NES bankruptcy estate under the APA included approximately $1 million paid by TCO for administrative expenses, plus the approximately $630,000 positive net effect of the Columbia Gas Entities subordinating their claims in the approximate amount of $3.9 million. *See id.* at 231–32, 236.[7] In total, the estimated value of the NES settlement was $4.33 million ($2.7 million + $1 million + $630,000). The Court will use $4.33 million as the "NES Settlement Value."

## C. The NGP Settlement

Approximately a year after the Court approved the APA in the NES case, NGP's case was initiated by an involuntary

Chapter 7 petition filed by McClatchey (on behalf of NES's estate) and other creditors. Ransier was appointed trustee of NGP's estate. TCO had decided long before the commencement of NGP's bankruptcy to pay $250,000 ("NGP Settlement Value") to any eventual NGP bankruptcy estate in order to settle the claims NGP had against TCO. Indeed, the first motion Ransier filed for approval of a compromise with TCO (Doc. 62) ("Initial Motion") suggested as much by referencing the APA's requirement that TCO pay $250,000 with respect to creditors filing claims in the NGP case. Initial Mot. at 4. *See also* Tr. at 48. Ransier negotiated for more, but TCO refused to budge. Tr. at 34–35, 39.

Concluding that he could obtain no more from TCO, Ransier filed the Initial Motion, stating that his independent analysis had led him to believe that "the compromise sum of $250,000.00 is reasonable and in the best interest of the creditors of this bankruptcy case." Initial Mot. at 6. As it turns out, the proposed settlement *was* reasonable and in the best interests of creditors, but this was not obvious from the Initial Motion. So after Fulson and Sanders objected, the Court entered an order (Doc. 87) denying the Initial Motion without prejudice, stating that it lacked the information necessary to enable the Court to independently assess whether the proposed settlement was fair and equitable and fell within the range of reasonableness.[8]

---

**7.** The amount of allowed unsecured claims in the NES case was approximately $3.8 million, *see* Disclosure Statement in Support of Tr.'s Plan of Liquidation, Case No. 03–67484, Doc. 524 at 11, and distributions on those claims was approximately $1,250,000, *see* Tr.'s Mot. for Entry of Final Decree Closing Chapter 11 Case, Case No. 03–67484, Doc. 633 at 2, so adding the Columbia Gas Entities' $3.9 million of claims would have reduced the distribution to unsecured creditors by (and given

the Columbia Gas Entities) approximately $630,000.

**8.** For the same reasons it denied the initial motion for approval of the NGP settlement, the order also denied initial motions for approval of settlements in the NEM and NGM cases, Case No. 09–52884 and Case No. 09–52885, respectively. Ransier filed second motions for approval of settlements with TCO in those cases, with TCO paying $250,000 in NEM's case and $50,000 in NGM's. Neither

Ransier addressed the Court's concerns with the filing of the Motion and his testimony during the hearing, providing several persuasive reasons for accepting TCO's offer of $250,000 to settle any claims NGP had against the Columbia Gas Entities. First, despite Sanders's suggestion to the contrary, Ransier did not blindly accept the $250,000 offered by TCO. Upon being appointed trustee, he independently reviewed the potential claims and met with a representative of the Columbia Gas Entities on several occasions to negotiate the terms of a settlement. Tr. at 33. He attempted to "build upon a theory or cause of action ... against Columbia Gas and its related entities[,]" Tr. at 26, but after reviewing the opinion approving the NES Sale Motion and consulting with McClatchey, see Tr. at 26, ultimately concluded he could not ignore two crucial aspects of the NES case that were equally relevant to NGP's case: Riley's persuasive testimony regarding the lack of a causal connection between TCO's alleged under-crediting and NES's demise, Mot. at 6, 13, and NGP's nearly immediate default on its loan agreement with RAG that facilitated NGP's acquisition of the wells. Tr. at 36; Mot. at 13. And Ransier concluded that there was no basis to assert that NGP's case for damages was any stronger than NES's.

To the contrary, there were several reasons to think that NGP's case against the Columbia Gas Entities was weaker. NGP sold gas from far fewer wells and for a shorter time than NES, Tr. at 28–29, and Ransier reasonably concluded that the wells NGP was permitted to keep were not the most profitable wells. Tr. at 36. Furthermore, the Tariff had been amended to require the metering of wells only if the

owner of the wells requested metering, and Ransier was unable to find any evidence that NGP had made such a request, so he reasonably determined that it was uncertain whether the requirement to meter wells applied in the NGP case. Tr. at 35–36; Mot. at 18 n. 5. Ransier met with Fulson, who "would be a key witness in any trial of this matter," but found him uncooperative and unable or unwilling to provide any support to Ransier in pursuing NGP's claims against the Columbia Gas Entities. Mot. at 14. See also Tr. at 25–26. He also consulted Sanders, but those conversations provided Ransier "little reason to question the results of his investigation and the value of the proposed compromise in the NGP case." Mot. at 14. Compared to the progress that had been made in the 2001 State Court Case prior to McClatchey's settlement on behalf of NES, Ransier determined that NGP's claims were "not prepackaged for trial and [that] the litigation ha[d] not evolved to the point as ... it was in the NES case." Mot. at 22. Ransier thus concluded that "the burden associated with litigating such claims would deter prospective purchasers [of the claims] other than TCO[,]" meaning that structuring the settlement as a sale of the estate's causes of action, as McClatchey had done in NES's bankruptcy, would not generate any additional consideration. Mot. at 22. See also Tr. at 28, 39–40.

Ransier estimated the range of potential recoverable damages (before attorneys' fees and expenses) to be between $120,000 and $1.1 million. Mot. at 20. He based the $120,000 figure on Fulson's testimony during a Bankruptcy Rule 2004 examination that the fair market value of the remaining 12 wells was $10,000 per well.

Fulson nor Sanders objected to those motions, and the Court approved them by orders that have become final and non-appealable.

Mot. at 9, 13, 20 & n. 7.[9] He calculated the upper end of $1.1 million by adding to the $120,000 figure an amount ($900,000) that Sanders asserted NGP would have received had NES paid for the gas it purchased from NGP.[10] But it was NES, not TCO, that failed to pay NGP. So Ransier concluded that NGP's failure to file a proof of claim in the NES case (the bar date had long ago passed) "certainly limits an argument for damages as against TCO by NGP" at the high end—if it had an argument at all. Mot. at 13. He also discounted Sanders's suggestion that NGP's damages might be worth $50 million. That amount, Ransier realized, was based on two flawed assumptions: (1) that the loss of all of NGP's wells, even wells lost before the NGP Agreement was executed, was directly attributable to TCO; and (2) that those wells would provide substantial profits for an extended time. Mot. at 20 n. 9. Those assumptions were inconsistent with the opinion approving the NES Sale Motion and, not surprisingly, Ransier rejected them. During the hearing, Sanders presented no evidence demonstrating any likelihood that NGP could recover such as extraordinary amount—or, for that matter, any evidence that NGP could obtain a net recovery in excess of the amount Ransier had realized through the settlement.

Given the potential obstacles to recovering damages, Ransier estimated the probability of recovery in the $120,000 to $1 million range at between 5% and 20%. Of course, the actual recovery to NGP's estate would be net of expenses, including expenses to pay attorneys and expert witnesses. Tr. at 45. Ransier also determined that the Columbia Gas Entities would litigate vigorously, including through any appellate process. Tr. at 39; Mot. at 20–21. He concluded that "the costs of trying to develop a case around these facts wouldn't produce that much additional cash to the estate than what was now being offered." Tr. at 46. And it could have produced nothing at all if NGP lost the litigation. Anticipating the Fulson and the Sanders Objections and the concomitant expense to the estate, Ransier tried to obtain more from the Columbia Gas Entities up until a day or two before he filed the Motion, but to no avail. Tr. at 52.

Ransier further justified the $250,000 settlement amount based on a comparison of the contractual periods and number of wells involved in the NES and NGP cases. Mot. at 19; Tr. at 28–29. Indeed, using the ratio of the NES Settlement Value ($4.33 million) to the number of NES Well–Months (4,554), and setting that ratio equal to the ratio of the NGP Settlement Value ($250,000) to the number of NGP Well–Months (240), the settlement value in the NGP case would be $228,194, even less than the actual NES Settlement Value of $250,000. Based on a similar comparison and the other considerations discussed above, Ransier concluded that "a guaranteed payment of $250,000" was well within the range of reasonableness. Mot. at 20.

## D. The Need for the Injunction

While the Motion and the Fulson and Sanders Objections were pending, Fulson,

9. During the hearing, Fulson testified that the remaining wells were sold for $10,000 in the aggregate. Tr. at 68. The reason for the discrepancy between Fulson's testimony during his deposition and his testimony during the hearing is unknown.

10. Actually, $900,000 plus $120,000 is only $1,020,000. Assuming that, like Sanders, any attorney litigating the claims on a contingency fee basis would receive one-third of the amount recovered, the range of possible net litigation outcomes is approximately two-thirds of the $120,000 to $1,020,000, or $80,000 to $680,000.

Sanders and Lowe were preparing to file the 2013 State Court Case, which they commenced in January 2013. Upon reading the Complaint,[11] Ransier saw that it alleged an "illegal scheme [by the Columbia Gas Entities] to eliminate the Nicole companies as competitors and unlawfully block them from redress in court." Compl. ¶ 34. According to the Complaint, the purported scheme was unlawful because the Columbia Gas Entities allegedly had violated the OCPA, which provides that "any person directly or indirectly injured" by certain conduct shall have "a cause of action for triple the actual damages the person sustained." Ohio Rev. Code Ann. § 2923.34(E) (West 2014). Fulson asserted the Ohio RICO Claims for damages in his purported capacity as the owner of NES and NGP.

Ransier's intent in settling with TCO and filing the Motion was to resolve all of NGP's claims against the Columbia Gas Entities, including derivative claims, and yet the Complaint asserted derivative claims against the Columbia Gas Entities that are property of NGP's estate. Thus, on February 13, 2013, Ransier filed a Notice of Bankruptcy and Suggestion of Stay with the State Court ("Stay Notice"). In response to the Stay Notice, the State Court entered an order ("Stay Order") providing that "[i]t appearing that this case has been stayed by the U.S. Bankruptcy Court ... this case is designated inactive pending further order of the Bankruptcy Court, or by motion of a party herein to proceed in a manner not stayed by that Court." Stay Order at 1. This Court did not and has not issued any order lifting the automatic stay, and Fulson never filed a motion "to proceed in a manner that is not stayed...." Instead, despite the Stay Order, Fulson filed an amended complaint ("Amended Complaint") (Doc. 124). Because the Amended Complaint was filed in violation of the State Court's own Stay Order, it is unclear whether the Amended Complaint operated as an effective amendment of the Complaint.

Although it ostensibly asserted claims only for damages sustained by NES in Fulson's purported capacity as the owner of NES, the Amended Complaint seems deliberately designed to say enough to permit a later amendment (once the NGP case is closed) in order for Fulson to reassert a claim for damages on account of injuries allegedly sustained by NGP. For example, the Amended Complaint alleged an illegal scheme to eliminate the "Nicole companies" as competitors and unlawfully block them from redress in court, Am. Compl. ¶ 34, and the Amended Complaint defined "Nicole companies" to include both NGP and NES. Am. Compl. ¶ 24.

Given the costs NGP's estate would incur as a result of the commencement of the 2013 State Court Case, Ransier requested additional consideration from the Columbia Gas Entities. Those discussions did not lead to an agreement by TCO to increase the amount of its settlement offer, but did result in confirmation that the NGP Ohio RICO Claims are part of the settlement.

In the Injunction Notice, the Court stated its intent to enjoin the NGP Ohio RICO Claims if they were judicially determined to be derivative of claims of NGP or otherwise to be property of NGP's bankruptcy estate. *See* Injunction Notice at 2. As noted above, in the companion opinion also issued today, the Court holds that the NGP Ohio RICO Claims are derivative of NGP's claims against the Columbia Gas Entities and are property of NGP's bankruptcy estate. Thus, the prerequisite for

**11.** A copy of the Complaint is attached as Exhibit 1 to the Contempt Motion.

enjoining the NGP Ohio RICO Claims has been satisfied.

### V. Legal Analysis

### A. The Standard Courts Use to Evaluate Proposed Settlements

 Ransier seeks approval of the Motion under Bankruptcy Rule 9019(a), which provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). As explained in *Nicole I,* when evaluating compromises under Bankruptcy Rule 9019(a), courts must "canvass the issues in order to determine whether the settlement falls below the lowest point in the range of reasonableness." *Nicole I,* 385 B.R. at 239 (internal quotation marks omitted). "[A]s long as the settlement falls within a range of reasonable compromises, it may be approved." *Id.* (internal quotation marks omitted). In order to determine whether a settlement is within the range of reasonableness, "the Court must review the agreement under the 'fair-and-equitable' standard." *Id.* at 210 (citing *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988)).

 Under this standard, courts consider four factors. First, courts analyze the probability of success in litigation, which "requires the court to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled." *Id.* at 239. When estimating the likely outcome of litigation, the Court, of course, "need not make a precise determination of the outcome" because "an exact judicial determination of the values in issue would defeat the purpose of compromising the claim." *Id.* Courts also apply three other factors—the difficulties to be encountered in collecting from the defendant, the complexity, expense and delay the trustee would face in

the litigation and, finally, the paramount interest of the creditors, giving proper deference to their reasonable views. *Id.* at 238–39.

### B. Application of the Standard

 Ransier estimated the potential range of recoveries from litigating NGP's claims against the Columbia Gas Entities to be between $120,000 to $1,020,000 and the probability of a recovery in that range at between 5% and 20%, Mot. at 20, which are reasonable estimates in light of the quality of the evidence that likely could be mustered on behalf of NGP. Any recovery from litigation would be reduced by attorneys' fees (possibly including a one-third contingency fee), meaning that the estimated outcome from litigation net of attorneys' fees could range from approximately $80,000 to $680,000. The $80,000 to $680,000 range would be further reduced by expert witness fees and other costs, which Ransier reasonably anticipated would be high given both the complexity of the litigation and the financial resources of the defendants, whose assets indeed made them collectable, but also eminently capable of funding drawn-out litigation at both the trial and, if necessary, appellate levels. Tr. at 38. Whether the range of possible recoveries is set at $120,000 to $1,020,000 or $80,000 to $680,000—and after expenses both of those ranges might be high—the NGP Settlement Value is well within the range of reasonableness. In addition, even if one gives Sanders every benefit of the doubt in determining the number of NGP Well–Months (i.e., by assuming the number of wells remaining was 12 and the term of the NGP Agreement was 20 months), the ratio of the NGP Settlement Value to the number of NGP Well–Months is proportionate to the ratio of the NES Settlement Value—which the Court has already determined was reasonable in a final, non-appealable order—to the number

of NES Well–Months. No matter how it is sliced, the settlement is fair and equitable and within the range of reasonableness.

Once the Motion was filed, therefore, the conclusion that the proposed settlement was fair and equitable and within the range of reasonableness should have been as clear to Sanders as it was to Ransier. Yet Sanders objected to the Motion and argued during the hearing that the NGP Settlement Value of $250,000 is unreasonable because it was negotiated without any awareness of NGP's claims against the Columbia Gas Entities under the OCPA. Tr. at 77. But there is no evidence suggesting that arguing for additional consideration based on the OCPA would have been successful. To the contrary, it seems highly unlikely that such an argument would have garnered any additional consideration for the estate. For if one assumes—as Sanders proposes Ransier should—that NGP had viable claims under the OCPA, then it also would be reasonable to assume that it had claims under RICO and that NES likewise had claims under both the OCPA and RICO. And during the hearing on the Contempt Motion, Sanders testified that he was familiar with RICO and had "done RICO work[.]" Doc. 175 at 71.

■ So that raises the question why Sanders, if he truly believed that NGP and NES had viable claims under the OCPA for treble damages (and therefore likely had claims under RICO), never asserted them in the 2001 State Court Case—after all, the evidence suggests that he is not one to leave money on the table. It also raises the question why he never brought the claims to the attention of McClatchey—who, after all, had retained Sanders as special counsel to represent the NES estate on a one-third contingency fee basis—or to the attention of Ransier, whom he ostensibly was trying to persuade that a higher settlement amount was in order. All this makes the filing of the 2013 State Court Case appear to be nothing more than a last-ditch effort to extract money from the Columbia Gas Entities by attempting to persuade a jury—which Sanders was so convinced would not be favorably disposed to the Columbia Gas Entities—to issue a verdict in favor of Fulson under the OCPA. But "[n]othing . . . requires a [trustee] to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice." *Ambac Fin. Grp.*, 457 B.R. at 305. And Ransier apparently had no appetite for such tactics. His unwillingness to attempt to re-trade the deal with TCO based on the OCPA—if doing so would even have been possible—was reasonable and appropriate.

Sanders also argued that the NGP Settlement Value of $250,000 is per se outside of the range of reasonableness because it was negotiated based on the mistaken belief that NGP lacked a contractual relationship with TCO. Tr. at 11, 76. That argument is untenable for two reasons. First, in an attempt to increase the NGP Settlement Value, Ransier negotiated with TCO right up until a day or two before filing the Motion—long after it became evident to him that NGP and TCO were parties to the NGP Agreement. Second, as explained above, even if one assumes that the NGP Agreement's term was the 20 months Sanders says it was, the NGP Settlement Value is firmly within the range of reasonableness. In short, the views of Sanders—the only creditor who objected to the Motion—are patently unreasonable. For all the reasons stated above, the NGP Settlement Value of $250,000 is fair and equitable and, considering Ransier's estimates of the possible recoveries through litigation, squarely

within the range of reasonable settlement amounts.

## C. Enjoining the NGP Ohio RICO Claims Is Appropriate

■ This leaves the question of whether the Court should enjoin the pursuit of the NGP Ohio RICO Claims as well as other claims that are property of NGP's estate (including, without limitation, claims that are derivative of those belonging to NGP's estate) and any such claims that might be asserted in the future. The Court concludes that such an injunction is appropriate.

As an initial matter, it bears noting that the Court has the jurisdiction referred to it by the district court over property of the estate. *See* 28 U.S.C. § 1334(e)(1) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate[.]"). In the companion opinion referred to above, the Court holds that the NGP Ohio RICO Claims are derivative of NGP's claims and are property of NGP's bankruptcy estate. Because the NGP Ohio RICO Claims are property of NGP's estate, the Court may enjoin parties other than the trustee from pursuing them.[12] *See Allard v. DeLorean (In re DeLorean Motor Co.),* No. 88–1275, 1989 WL 63256, at *2 (6th Cir. June 14, 1989). Indeed, orders approving settlements often contain injunctions against the pursuit of claims that are derivative of claims of

the debtor and that therefore are property of the estate.[13]

■ "[I]t is well-settled that a bankruptcy court may 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the bankruptcy code." *Id.* at *2 (quoting 11 U.S.C. § 105). Section 105 "gives bankruptcy court[s] [the] power to enjoin suits against non-parties in state court if failure to enjoin would adversely affect [the] bankruptcy estate...." *Id.* (internal quotation marks omitted). Here, the failure to enjoin the NGP Ohio RICO Claims would adversely affect NGP's estate by permitting entities other than Ransier to assert those claims, scuttling the settlement he struck with TCO, to the detriment of NGP's creditors. As previously discussed, after TCO became aware of the 2013 State Court Case it agreed to pay the settlement amount of $250,000 only if the Court enjoined all entities from pursuing derivative claims and other claims that are property of NGP's bankruptcy estate, including the NGP Ohio RICO Claims. Sanders and Lowe argue that TCO did not have the right to impose that condition after having already reached an agreement with Ransier. Injunction Resp. at 1, 15. But Ransier did not see it that way; he has agreed to the injunction as a condition of the settlement. If he had not done so, then the Court would be faced with having to decide whether the settlement should be enforced against TCO absent the injunction. As things stand, Ransier has agreed to the injunction, the settlement with the injunction is the only deal on the table, and

---

**12.** In fact, Sanders and Lowe "do not dispute that the Court has the authority" to enjoin claims that are property of a debtor's estate. Injunction Resp. at 1.

**13.** *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* Case No. 08–1789, 2011 WL 10549389 (Bankr.S.D.N.Y. Jan. 13, 2011),

*aff'd sub nom. Fox v. Picard (In re Madoff),* 848 F.Supp.2d 469 (S.D.N.Y.2012), *aff'd sub nom. Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),* 740 F.3d 81 (2d Cir. 2014); *Griffin v. Bonapfel (In re All Am. of Ashburn, Inc.),* 805 F.2d 1515, 1518 (11th Cir.1986).

the Court has provided adequate notice of the proposed injunction.

Sanders and Lowe argue that the injunction is unnecessary because they cured any stay violation in the original OCPA complaint by filing the Amended Complaint. Even if that were true, there is too much evidence suggesting that they cannot be trusted to refrain from reasserting the NGP Ohio RICO Claims once the NGP case is closed. As discussed above, the Amended Complaint seems deliberately designed to say just enough to permit a later amendment—once the NGP case is closed—in order to re-allege damages to Fulson based on injuries purportedly suffered by NGP. And it appears that such an amendment was the intent, as evidenced by the Injunction Response. There would have been no point in Lowe's and Sanders's opposing the proposed injunction if they did not intend to further amend the Amended Complaint to reassert damages on account of injury to NGP once NGP's bankruptcy case closed. It is telling that they do not limit their argument in the Injunction Response to the propriety of the claims asserted in the Amended Complaint, but also contend that the claims asserted in the original Complaint as well should not be enjoined; that is, indeed, their primary argument. *See* Injunction Resp. at 2–15. In sum, even after Fulson filed the Stay Notice, and after the State Court entered the Stay Order and this Court entered its show cause order, the Sanders and Lowe have persisted, going so far as to oppose the injunction that is a prerequisite to TCO's willingness to consummate the settlement with Ransier and then, just recently, substituting Fulson's probate estate as the plaintiff in the 2013 State Court Case.

Yet there is more. During the hearing on the Contempt Motion, Sanders conceded that "as long as [a settlement amount is] reasonable, even if it's less than what the Court itself might think is appropriate, if it's reasonable, the business judgment of the trustee must be respected and the settlement must be approved." Doc. 175 at 81. As explained above, Sanders had to have known that the NGP Settlement Value was within the range of reasonableness; in fact, he said that he did not have any quarrel with Ransier's actions as trustee. It should have been equally clear to him that requiring Ransier to continue to defend the Motion would, rather than increasing the NGP Settlement Value, only increase the expenses the estate had already incurred, thereby decreasing the funds available for distribution to creditors, including Sanders himself. Assuming that it was not his intent to spend his time and other resources engaging in efforts that would only reduce his own recovery from the NGP estate along with other creditors' recoveries, it is difficult to see what Sanders hoped to accomplish. The only motivation the Court can fathom is that Sanders did not wish to be in the position of having to explain to the finder of fact in the 2013 State Court Case—perhaps the jury that he believed would share his negative view of the Columbia Gas Entities—why he had not objected to the Motion if he believed that the claims on which Fulson was seeking to recover were worth millions more than the amount for which Ransier was settling. But Fulson had no right to bring the claims asserted in the 2013 State Court Case—the NES Ohio RICO Claims because they had been sold to TCO and the NGP Ohio RICO Claims because they are property of NGP's estate and are being settled by Ransier. For all these reasons, it is appropriate to enjoin the NGP Ohio RICO Claims and other claims that are property of NGP's estate.

## VI. Conclusion

The settlement between Ransier and the Columbia Gas Entities is fair and equitable and within the range of reasonableness. Therefore, the Motion is **GRANTED** and the settlement, as outlined therein, is **APPROVED** under Bankruptcy Rule 9019. The Court also permanently **ENJOINS** all entities from pursuing the NGP Ohio RICO Claims as well as all other claims that are property of NGP's estate (including, without limitation, claims that are derivative of those belonging to NGP's estate) and any such claims that might be asserted in the future.

**IT IS SO ORDERED.**