**IN RE: NICOLE GAS PRODUCTION, LTD., Debtor.**

**Case No. 09–52887**

United States Bankruptcy Court, S.D. Ohio, Eastern Division, **at Columbus.**

Signed December 10, 2015

Nicole Gas Production Ltd., Westerville, Oh, pro se.

*MEMORANDUM OPINION AND ORDER AWARDING FREDERICK RANSIER ATTORNEYS' FEES AND EXPENSES INCURRED AS A RESULT OF CIVIL CONTEMPT*

John E. Hoffman Jr., Unites States Bankruptcy Judge

## I. Introduction

The Court previously held three individuals in civil contempt for commencing and continuing a state court action asserting claims belonging to the bankruptcy estate of Nicole Gas Production, Ltd. ("NGP"). Frederick L. Ransier, III ("Ransier"), the Chapter 7 trustee of NGP's estate, requests an award of the reasonable attorneys' fees and expenses he has incurred to date as a result of the contemptuous conduct. For the reasons explained below, the Court awards Ransier fees and expenses in the amount of $91,068.

## II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this contested matter under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

The Court also has the constitutional authority to enter a final order awarding professional fees and costs incurred as a result of contemptuous conduct. *See In re Brown,* 511 B.R. 843, 848 (Bankr.S.D.Tex. 2014) (holding that bankruptcy courts have the constitutional authority to impose sanctions for contempt after *Stern v. Marshall,* — U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)); *In re Green,* No. 12–13410, 2014 WL 1089843, at *1 (Bankr.N.D.Ohio Mar. 19, 2014) (same); *Schermerhorn v. Centurytel, Inc. (In re Skyport Global Commc'ns),* No. 08–36737–H4–11, 2013

WL 4046397, at *41 (Bankr.S.D.Tex. Aug. 7, 2013) (same).

## III. Procedural Background

Earlier in this case, Ransier filed a motion requesting that the Court enter an order directing Freddie Fulson ("Fulson") and the attorneys who represented him in the state court action—Robert Sanders ("Sanders") and James Lowe ("Lowe" and, together with Sanders and Fulson, the "Fulson Parties")—to appear and show cause why they should not be held in civil contempt (the "Contempt Motion") (Doc. 119). The Court held an evidentiary hearing on the issue of whether the Fulson Parties should be held in civil contempt (the "Contempt Hearing"). Following the Contempt Hearing, Fulson passed away, and his probate estate was substituted as the plaintiff in the state court case, effectively substituting his estate (the "Fulson Estate") as a party in interest in this contested matter. *See* Docs. 188 & 190. The co-administrators of the Fulson Estate are Curtland H. Caffey and S. Brewster Randall, II, Esq. (the "Co-administrators").

Based on the evidence presented at the Contempt Hearing, the Court entered an opinion and order (the *"Contempt Opinion"*) holding that the Fulson Parties "violated the automatic stay and were in contempt of Court when they commenced and continued the state court action." *In re Nicole Gas Prod., Ltd.*, 519 B.R. 723, 725 (Bankr.S.D.Ohio 2014). The Contempt Opinion also established a procedure for the Court to determine the amount of damages the NGP estate sustained as a result of the Fulson Parties' contemptuous conduct. In accordance with this procedure, Ransier filed a statement of the time and expenses incurred by professionals from his law firm, Vorys, Sater, Seymour and Pease LLP ("Vorys"), as of the date the statement was filed (the "First Fee Statement"), together with a supporting affidavit (the "Ransier Affidavit") (Doc. 200).[1] Lowe filed an objection to the First Fee Statement (the "Lowe Objection") (Doc. 201), and Sanders filed an objection as well (the "Sanders Objection") (Doc. 202). Ransier then filed a combined reply to the Lowe Objection and the Sanders Objection (the "Ransier Reply") (Doc. 206).

Although the Court provided Sanders, Lowe and the Co-administrators with notice of the entry of the Contempt Opinion, Docs. 196 & 199, Ransier gave notice of the filing of the First Fee Statement to Sanders and Lowe, but not to the Co-administrators. After the Court made Ransier aware of the need to provide the Co-administrators with notice of the First Fee Statement, he served it on them under the terms of an agreed order among the Co-administrators, Sanders and Lowe (the "Agreed Order") (Doc. 246). The Agreed Order established a schedule under which the Co-administrators filed an objection to the First Fee Statement (the "Co-administrators Objection") (Doc. 248) and Ransier filed a reply to their objection (Doc. 250). The Court will refer to Lowe, Sanders and the Co-administrators collectively as the "Objectors."

The Court held a hearing to consider the amount of fees and expenses that should

---

1. Ransier previously had filed an application pursuant to § 327 of the Bankruptcy Code seeking an order approving his retention of Vorys to represent NGP's estate. Doc. 24. Under the Bankruptcy Code, the "court may authorize the trustee to act as attorney or accountant for the estate if such authorization is in the best interest of the estate." 11 U.S.C. § 327(d). Finding that Ransier and Vorys "are qualified to act as attorneys ... and that it is in the best interests of the estate that [Ransier] be authorized to retain said law firm, with Frederick L. Ransier as case attorney," the Court entered an order approving the retention. Doc. 26.

be awarded to Ransier (the "Fee Hearing"). At the Fee Hearing, Ransier testified in support of the fees and expenses charged by the Vorys professionals who rendered the legal services he asserted were necessary to respond to the Fulson Parties' contemptuous conduct. During the Fee Hearing, the Court admitted the following documents into evidence without objection: (1) Ransier's Exhibit 1 (the First Fee Statement), Exhibit 1A (the Ransier Affidavit) and Exhibit 2 (a document setting forth Ransier's expenses); and (2) Lowe's Exhibit A (a version of the First Fee Statement annotated with paragraph numbers 1 through 303).

At the conclusion of the Fee Hearing, the Court asked Ransier to file (1) an affidavit explaining Vorys's billing policy with respect to computerized legal research and (2) a supplemental statement of the fees and expenses incurred since the First Fee Statement was filed. On October 6, 2015, Vorys attorney Brenda Bowers filed an affidavit (the "Bowers Affidavit") in support of a statement of the time and expenses incurred since the filing of the First Fee Statement (the "Second Fee Statement") (Doc. 252). On November 6, 2015, at the Court's request, the parties filed a Notice of Submission of Reviewed and Numbered Supplemental Fee Statement Pursuant to Contempt Order (Doc. 253), attaching a copy of the Second Fee Statement annotated with paragraph numbers 304 through 444).[2]

The Court will assume that the Objectors oppose Ransier's recovery of the fees and expenses set forth in the Second Fee Statement on the same grounds that they objected to the First Fee Statement. Accordingly, the Court will deem the Sanders, Lowe and Co-administrators' Objections to be objections to both the First and Second Fee Statements.

## IV. Findings of Fact

In this opinion, the Court uses defined terms contained in the Contempt Opinion and incorporates by reference the findings of fact set forth in the Contempt Opinion. Based on the evidence introduced during the Contempt Hearing and the Fee Hearing, including the documentary evidence and the testimony presented, and having found Ransier to be a highly credible witness, the Court makes the following additional findings of fact.

### A. The Total Amount of Fees and Expenses Requested

In the First Fee Statement, Ransier attributed a total of $68,476.50 of fees and $3,788.48 of expenses to the Fulson Parties' contempt. According to the Bowers Affidavit and the Second Fee Statement, after Ransier filed the First Fee Statement, he incurred additional fees of $22,972 and additional expenses of $149.27. Thus, the amount of fees Ransier seeks to recover is $91,448.50, and the amount of expenses is $3,937.75, for a total award of fees and expenses in the amount of $95,386.25. Bowers Aff. ¶ 8.

### B. Fees

■ Because Ransier is the Chapter 7 trustee of NGP's bankruptcy estate as well as an attorney for the estate, the Court "may allow compensation for [his] services as such attorney . . . only to the extent that [he] performed services as attorney . . . for the estate and not for performance of any of [his] duties that are generally performed by a trustee without the assistance of an attorney . . . for the estate."

---

2. The annotated Second Fee Statement included two entries numbered 326 and no entry numbered 435. Nonetheless, in order to avoid confusion, the Court will use the numbers from the annotated version submitted by the parties.

11 U.S.C. § 328(b). Litigating a contested matter such as this contempt proceeding certainly requires an attorney's professional skills. *See, e.g., Gordon v. Walton (In re Hambrick)*, No. 08–66265, 2012 WL 10739279, at *5 (Bankr.N.D.Ga. Apr. 10, 2012). Ransier testified that he was careful to separate the work that he performed as Chapter 7 trustee of the NGP estate—and work that other professionals at his firm performed on his behalf in his capacity as Chapter 7 trustee—from the services that he and others provided as counsel in this contested matter. The Court finds that Ransier and the other Vorys attorneys billed only for time spent representing the estate as counsel, not as the Chapter 7 trustee. That said, Ransier may recover the fees set forth in the First and Second Fee Statements (collectively, the "Fee Statements") only to the extent that (1) the hourly rates of the professionals who represented NGP's estate in this matter were reasonable and (2) the time spent was both reasonable and expended as a result of the Fulson Parties' contempt.

**1. Hourly Rates**

The Fee Statements identify the professionals who represented NGP's estate in this contempt matter together with their hourly rates. Ransier testified that the rates charged by the Vorys professionals in this matter reflect the firm's rates in 2009 (the year the NGP case was commenced) rather than the rates in place at the time the services were performed from 2013 through 2015. The parties stipulated in the Agreed Order that the "hourly rates of the attorneys and paralegals within the [First Fee Statement] are reasonable, standard and customary for similarly situated attorneys and paralegals

in bankruptcy litigation throughout Ohio and the Midwest for similar bankruptcy litigation matters" and that "[t]here shall be no expert witnesses required as to the reasonableness of the hourly rates." Agreed Order ¶ B.

Ransier has been licensed to practice law since 1974 and has been a panel Chapter 7 trustee in the Southern District of Ohio since 1988. In his capacity as a Chapter 7 trustee, Ransier has extensive experience in reviewing fee requests made in a variety of different contexts, including fee requests made in connection with motions for contempt. He also serves on the management committee of Vorys and in that role annually reviews billing rates of attorneys at firms comparable to Vorys. Based on this experience, he testified that the rates charged by the Vorys professionals in this contempt matter are reasonable and customary for similarly situated professionals in bankruptcy litigation in the Columbus area. Relying on the parties' stipulation, Ransier's testimony, and its own knowledge and experience, the Court concludes that the hourly rates set forth in the Fee Statements are consistent with the "prevailing market rate," that is, the rate that professionals of "comparable skill and experience can reasonably expect to command" in this Court.[3]

**2. Time Spent**

The Court has an independent duty to review the Fee Statements and to reduce them if any of the fees sought were not incurred as a result of the Fulson Parties' contempt. This independent duty applies even to time not specifically challenged by the Objectors. *See Smith v. Serv. Master Corp.*, 592 Fed.Appx. 363, 367 (6th Cir. 2014).

---

**3.** *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir.2013) (internal quotation marks omitted).

During the Fee Hearing, Lowe objected to a few time entries relating to Ransier's request to continue the hearings scheduled on his objections to the proofs of claim filed by Fulson and Sanders against the NGP estate. The Court then brought to the parties' attention the fact that the First Fee Statement included several other entries relating to the objections to the proofs of claim. None of this time was incurred as a result of the Fulson Parties' contempt. Ransier testified that he did not intend to include those entries in the First Fee Statement and conceded that such time should not be part of the contempt sanction. The Second Fee Statement also includes one time entry relating to the proofs of claim.

The following chart sets forth the reductions the Court is making to the Fee Statements based on the inadvertent inclusion of time spent with respect to claim objections:

| No.[4] | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees)[5] |
|---|---|---|---|---|
| 115 | 9/27/13 | Bowers | Reviewed orders from Court regarding hearings on motion to show cause and objections to claims. Reviewed hearing dates with Mr. Ransier—.50 | $.25 \times \$285 =$ ($71.25) |
| 116 | 9/28/13 | Bowers | Reviewed orders from Court on: Hearing Notice of Motion to Compromise; Order to Show Cause and Setting Hearing on Fulson, Lowe, and Sanders; Order on objection to Sanders' Proof of Claim and Setting Hearing on the Same; and Order on Objection to Fulson's Proof of Claim and Setting Hearing on the Same—1.0 | $.50 \times \$285 =$ ($142.50) |
| 117 | 9/30/13 | Bowers | Reviewed orders on sanctions/show cause, proof of claim and motion to compromise and docketed dates—.30 | $.10 \times \$285 =$ ($28.50) |

[Editor's Note: The preceding image contains the reference for footnotes [4, 5]]

4. The number used to designate each entry is taken from the version of the First Fee Statement submitted as Lowe's Exhibit A and the version of the Second Fee Statement submitted by the parties as docket number 253.

5. Several time entries contain both compensable and non-compensable time. As explained in Section V.B.12 below, the Court is permitted to estimate the non-compensable time and reduce the Fee Statements accordingly.

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|---|---|---|---|---|
| 119 | 10/1/13 | Bowers | Drafted memo to Ms. Fromme and Mr. Ransier regarding documents filed related to Fulson and Sanders proofs claim, motion to compromise, and motions to show cause—.30 | .10 × $285 = ($28.50) |
| 120 | 10/3/13 | Ransier | Attention to e-mail concerning Orders entered setting hearings relative to show cause motions and claims objections. Draft e-mail to Ms. Bowers concerning same—.50 | .30 × $380 = ($114) |
| 121 | 10/3/13 | Fromme | Review Show Cause Order as to Claim Objections and Show Cause Order as to the Contempt Motion and authorities in support thereof. Prepare summary and analysis for Messrs. Ransier and Bowers regarding the same—2.20 | 1.10 × 230 = ($253) |
| 124 | 10/7/13 | Ransier | Review show cause order on Trustee objection to Sanders claim—.20 | .20 × $380 = ($76) |
| 144 | 11/5/13 | Ransier | Conference with Ms. Bowers concerning hearing request by Mr. Fulson. Consideration as to whether request complies with Order—.30 | .30 × $380 = ($114) |
| 145 | 11/05/13 | Bowers | Conference with Mr. Ransier regarding continuance for hearings scheduled on December 9 and 10, 2013 and rescheduling hearing on Motion to Show Cause—.20 | .10 × $285 = ($28.50) |
| 150 | 11/14/13 | Bowers | Reviewed e-mail regarding potential continuance rescheduling date(s) for hearings on objection to show cause, objection to proof of claim, and second motion to compromise—.20 | .10 × $285 = ($28.50) |

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|---|---|---|---|---|
| 155 | 11/26/13 | Bowers | Telephone conferences with Court regarding dates available for continuance dates for hearings on claim objection, second motion to compromise and motion to show cause—.20 | .10 × $285 = ($28.50) |
| 156 | 11/26/13 | Bowers | Drafted e-mails to and telephone conferences with counsel regarding potential dates for continuances of hearings on motion to show cause, objection to proof of claim, and second motion to compromise—.40 | .20 × $285 = ($57) |
| 157 | 11/27/13 | Bowers | Drafted orders continuing hearings on proof of claim objection, show cause hearing, and second motion for compromise—.60 | .20 × $285 = ($57) |
| 158 | 12/2/13 | Bowers | Updated orders on continuance and prepared for uploading with court on motion to show cause, objection to claim, and second motion to compromise —.20 | .10 × $285 = ($28.50) |
| 165 | 1/11/14 | Bowers | Reviewed Fulson's Response to Second Order to Show Cause Why Trustee's Objection to Fulson's Proof of Claim Should Not Be Sustained. Drafted memo to Ms. Fromme and Mr. Ransier regarding the same—.40 | .40 × $285 = ($114) |
| 345 | 1/28/15 | Tobin | Finalize and file objections to claims—.80 | .80 × $125 = ($100) |

Subtotal: $1,269.75

Certain of the fees that the Court is reducing relate to services performed with respect to a request for a continuance of a hearing scheduled on Ransier's objection to the proofs of claim of Fulson and Sanders. During the Fee Hearing, counsel for Lowe argued that fees resulting from Ransier's request to continue the hearing on the Contempt Motion also should not be charged to the Fulson Parties, because the reason for the request was Ransier's unavailability on the date scheduled by the Court. Ransier, however, would not have needed to file the Contempt Motion—and thus would not have needed to file a motion to continue the hearing scheduled by the Court—were it not for the Fulson Parties' contempt. The Court accordingly declines to reduces the fees requested by Ransier for time spent requesting a continuance of the Contempt Hearing.

The following chart sets forth the reductions the Court is making to the Fee Statements based on the inclusion of time—in addition to the time spent objecting to Fulson's and Sanders' proofs of claim—

that does not appear to have been incurred as a result of the Fulson Parties contempt:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|-----|------|-------------|----------------------------------|------------------------------|
| 386 | 6/5/15 | Bowers | Reviewed Kendig decision regarding trustee files—.30 | .30 × $285 = ($85.50) |
| 432 | 9/20/15 | Bowers | Reviewed IRS voucher/notice for 2013. Drafted memo to Mr. Ransier regarding receipt of said notice—.20 | .20 × $285 = ($57) |

Subtotal: $142.50

In the Second Fee Statement, Ransier requests that the Fulson Parties pay the fees he incurred analyzing the issue of whether he may charge them for on-line legal research expenses. But, as explained in Section IV.C below, the Court cannot award Ransier the expenses he requests for on-line legal research, because those expenses were not incurred as a result of the Fulson Parties' contempt. It would not be consistent or appropriate to award Ransier the fees he incurred analyzing the issue of whether he may charge the Fulson Parties the expenses incurred for on-line legal research given the Court's determination that such expenses are not recoverable. The Court accordingly must make the following reductions to the Fee Statements:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|-----|------|-------------|----------------------------------|------------------------------|
| 438 | 9/22/15 | Giberson | Office conference with Ms. Bowers and Ms. Hanrahan regarding online legal research billing detail and protocol per court request—.50 | .50 × $285 = ($142.50) |
| 442 | 9/22/15 | Bowers | Meeting on the legal costs of computer legal research with Mses. Hanrahan and Giberson and reviewed materials on Lexis computer research—1.0 | 1.0 × $285 = ($285) |
| 443 | 9/23/15 | Bowers | Reviewed statement of fees as related to legal research and drafted memo to Ms. Hanrahan regarding the same—.70 | .70 × $285 = ($199.50) |

Subtotal: $627

In sum, as a result of its independent review, the Court is reducing Ransier's fees by $2,039.25. As explained in Section V.B below, the Court is reducing the fees by an additional $398 as a result of the objections. *See* Sections V.B.12 (reduction of $159.50) & V.B.14 (reduction of $238.50). This results in a total fee reduction of $2,437.25.

Based on Ransier's testimony and a line-by-line review of the Fee Statements, the Court concludes that the remainder of the

fees sought by Ransier were reasonably and necessarily incurred as a result of the Fulson Parties' persistent attempts to exercise control over property of NGP's bankruptcy estate. As the Court explained in the Contempt Opinion, Fulson commenced the 2013 State Court Case against Columbia Gas Transmission, LLC ("TCO") and the other Columbia Gas Entities, and the Complaint commencing the lawsuit, as well as the Amended Complaint, identified Sanders and Lowe as Fulson's counsel. The "Fulson Parties violated the automatic stay and were in contempt of Court when they commenced and continued the 2013 State Court Case." *Contempt Op.*, 519 B.R. at 755. As a result of the Fulson Parties' contemptuous conduct, the Vorys professionals spent time analyzing the Complaint and the Amended Complaint. They also assessed the implications of those pleadings for the settlement that Ransier had reached with the Columbia Gas Entities, a settlement under which NGP's estate would receive a $250,000 cash payment in exchange for a release of any claims NGP had or may have against the Columbia Gas Entities.

After conducting this assessment, Ransier or his counsel prepared and filed the Stay Notice with the State Court. Lowe specifically objects to 11 time entries related to the preparation of the Stay Notice, contending that the amount of time spent was excessive. Lowe Objection at 9. But it was the Fulson Parties' contempt that necessitated the preparation of the Stay Notice. And all but one of those 11 entries includes time incurred for other services performed as a result of the Fulson Parties' contempt. After reviewing the 11 entries, the Court finds that the total amount of time spent on the Stay Notice itself was, as Lowe suggests it should have been, relatively minimal, and therefore reasonable.

As a result of the Fulson Parties' contempt, the Vorys professionals also expended time preparing the Contempt Motion; researching and reviewing legal and factual issues related to the Contempt Motion; preparing scheduling orders and a brief in support of the Contempt Motion; reviewing and evaluating the Fulson Parties' response to the Contempt Motion and numerous other documents the Fulson Parties filed with the Court, including motions for reconsideration of the Show Cause Order entered on the Contempt Motion and a request for certification of an issue to the Supreme Court of Ohio; drafting Ransier's reply in support of the Contempt Motion; reviewing the reopening of the bankruptcy case of Nicole Energy Services, Inc. ("NES"), which occurred as a result of the filing of the 2013 State Court Case; preparing argument, witnesses and exhibits for the Contempt Hearing; analyzing briefs filed by the Fulson Parties after the Contempt Hearing and preparing a reply to those briefs; reviewing the authority cited in the notice issued by the Court (the "Injunction Notice") regarding its intent to permanently enjoin all entities from pursuing claims that are property of NGP's estate, including, without limitation, claims that are derivative of those belonging to NGP's estate (the "Injunction"); researching authority in support of the Injunction and preparing a supporting brief; analyzing Lowe's and Sanders's response filed in opposition to the Injunction Notice and preparing a reply to the response; reviewing and responding to the concerns that TCO expressed about the Settlement Motion as a result of the filing of the Complaint and the Amended Complaint and negotiating with TCO regarding the settlement; addressing Sanders's and Fulson's objections to the Settlement Motion; and reviewing and analyzing the impact of Fulson's death and the substitution of the

representatives of the Fulson Estate in the 2013 State Court Case.

All of the time spent on these matters was reasonable and was expended as a result of the Fulson Parties' contempt. But for their contemptuous conduct, it would have been unnecessary for the Vorys professionals to incur this time. The finding that the time was reasonable and that it was incurred as a result of the contempt includes those fees to which Lowe and Sanders specifically object— those relating to the Injunction (discussed in Section V.B.6 below), those incurred researching and otherwise addressing the effect of Fulson's death (discussed in Section V.B.7) and those related to monitoring the NES bankruptcy case (discussed in Section V.B.8). The Court's findings of fact include any findings set forth in Section V.

Neither Lowe nor Sanders expressly objected to the fees relating to the Settlement Motion. In an exercise of its independent duty to review the Fee Statements, however, the Court will make more detailed findings with respect to the fees relating to the Settlement Motion.[6] As the Court previously explained, Ransier requested in the Settlement Motion that the Court authorize him to accept a cash payment of $250,000 in exchange for complete releases of any and all claims that NGP's bankruptcy estate had or might have against the Columbia Gas Entities. *Contempt Op.*, 519 B.R. at 729. The Court entered an opinion and order granting the Settlement Motion and issuing the Injunction (the *"Settlement and Injunction Order"*) contemporaneously with the Contempt Opinion. *See In re Nicole Gas Prod., Ltd.*, 518 B.R. 429 (Bankr.S.D.Ohio 2014).[7]

Ransier's intent in settling with the Columbia Gas Entities and filing the Settlement Motion was to compromise any and all claims that NGP's bankruptcy estate had or might have against the Columbia Gas Entities. *Contempt Op.*, 519 B.R. at 732–33. Yet in the 2013 State Court Case Fulson asserted claims against the Columbia Gas Entities that were property of NGP's estate. In addition to filing the 2013 State Court Case, Fulson and Sanders also filed objections to the Settlement Motion. *Id.* at 729. During the Contempt Hearing, Ransier testified about his belief

---

6. "The Settlement Motion actually was the second motion Ransier filed for approval of a compromise of claims between NGP and the Columbia Gas Entities." *Contempt Op.*, 519 B.R. at 729. The Court denied the first settlement motion, and no fees related to that motion are included in the Fee Statements. Nor are any fees related to the mere preparation and filing of the Settlement Motion included in the Fee Statements. Rather, the requested fees relate to Sanders's and Fulson's objections to the Settlement Motion.

7. The Settlement and Injunction Order appears to have been a final order for two reasons. First, it approved a settlement. *See Vickers v. IRS (In re Fortier)*, 161 Fed.Appx. 514, 517 (6th Cir.2005) ("In this case, the bankruptcy court's sale order was final... It gave effect to a settlement among the parties regarding the proceeds from the sale of ... property. The order specified that the property would be sold according to the terms of that settlement, and it specified the exact distribution of the sale proceeds."). Second, the Settlement and Injunction Order *"permanently* [enjoined] all entities from pursuing the NGP Ohio RICO Claims as well as all other claims that are property of NGP's estate...." *Settlement & Inj. Order*, 518 B.R. at 445 (emphasis added). "An order granting a permanent injunction is a final order." *Golden Gate Hotel Ass'n v. City & Cnty. of S.F.*, 18 F.3d 1482, 1483 (9th Cir.1994) (citing *Mayor & Aldermen of Vicksburg v. Henson*, 231 U.S. 259, 267, 34 S.Ct. 95, 58 L.Ed. 209 (1913)); *see also, e.g, Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 26 n. 4 (2d Cir.1982)). No party appealed the Settlement and Injunction Order.

as to why Fulson and Sanders filed their objections to the Settlement Motion:

THE COURT: Mr. Ransier, assuming the Court will grant the relief requested and impose sanctions for violating the automatic stay, is it your intention to seek to recover only those fees and expenses relating to responding to the [NGP Ohio RICO Claims], or would the fees and expenses that your law firm will seek to recover also include fees and expenses incurred in response to the objections to the motion to compromise the claims against Columbia Gas Transmission?

A: The problem we're having here, we have some inconsistent things going on. We have an objection to the amount of our compromise filed in the bankruptcy court and then we have another cause of action asserting damages for Mr. Fulson arising out of those same claims. On the one hand I don't understand why he would be objecting in the bankruptcy court because if his theory were to prevail he would get more if the settlement was less. So I don't know that I can untie the fact that we're dealing with—and, in fact, I believe the objections are pretty much the same as the allegations that are in the complaint. It's kind of hard for me to tear them apart. But it would not be my intent to, in the ordinary course of a bankruptcy case, it would not have been my intent to seek sanctions on a compromise motion that ended up in some dispute. In this case there's a relationship, I believe there's a direct relationship, between the objections made in the case—I'm sorry, in the bankruptcy case—to the compromise and the claims that were being asserted in the state court.

. . . .

They're inextricably tied. In the ordinary bankruptcy case there could be objections filed to a proposed compromise; I would not be seeking attorney fees. In this case the objection found itself into the [Complaint filed in the State Court].

Hr'g Tr. (Doc. 175) at 55–58.

In short, Ransier determined that he could not separate his work on the Contempt Motion from his work defending the Settlement Motion against challenges that were essentially part and parcel of the contempt. It therefore makes sense for Ransier to seek reimbursement for fees incurred and equitable and that the Court should issue the Injunction:

Once the [Settlement Motion] was filed ... the conclusion that the proposed settlement was fair and equitable and within the range of reasonableness should have been as clear to Sanders as it was to Ransier.

. . . .

It should have been equally clear to [Sanders] that requiring Ransier to continue to defend the [Settlement Motion] would, rather than increasing the [value of the settlement], only increase the expenses the estate had already incurred, thereby decreasing the funds available for distribution to creditors, including Sanders himself. Assuming that it was not his intent to spend his time and other resources engaging in efforts that would only reduce his own recovery from the NGP estate along with other creditors' recoveries, it is difficult to see what Sanders hoped to accomplish. The only motivation the Court can fathom is that Sanders did not wish to be in the position of having to explain to the finder of fact in the 2013 State Court Case— perhaps the jury that he believed would share his negative view of the Columbia Gas Entities—why he had not objected to the [Settlement Motion] if he believed that the claims on which Fulson was

seeking to recover were worth millions more than the amount for which Ransier was settling.

*Settlement & Inj. Order,* 518 B.R. at 442, 444. Again, the Settlement and Injunction Order is a final order from which no party appealed.

In light of the foregoing, other than the time represented by the $2,437.25 amount by which the Court is reducing Ransier's fees, the Court finds that all of the fees set forth in the Fee Statements were incurred as a result of the Fulson Parties' contempt and are compensable. In sum, fees in the amount of $89,011.25 (the $91,448.50 requested in the Fee Statements minus $2,437.25) are reasonable and necessary and were incurred as a result of the Fulson Parties' contempt.

## C. Expenses

■ In the First Fee Statement, Ransier seeks to recover expenses in the amount of $3,788.48 and in the Second Fee Statement additional expenses of $149.27, for total expenses of $3,937.75. Of this amount, $1,860.38 is for on-line legal research ($1,837.88 in the First Fee Statement and $22.50 in the Second Fee Statement). In the affidavit regarding Vorys's billing practices with respect to computerized legal research that the Court requested during the Fee Hearing, Bowers stated:

> The Vorys firm has a flat fee arrangement for computer legal research such as Lexis/Nexis. In order to recoup the flat fee arrangement for each search, Lexis/Nexis gives to the Vorys firm a report showing a retail charge based upon the search/searches done. Vorys charges its clients 25% of that retail charge in order to recoup the flat fee costs and expenses. The Lexis/Nexis computer research charges shown on the statement of fees relat-

ed to this matter were calculated as stated herein.

Bowers Aff. ¶ 9.

Based on the Bowers Affidavit, the Court concludes that Vorys would have incurred the flat fee owed to Lexis/Nexis for electronic legal research regardless of the Fulson Parties' contempt. *See Serv. Master Corp.,* 592 Fed.Appx. at 368 ("If the lawyer or firm pays a blanket access fee, rather than per search, there is no reason to distinguish the on-line research cost from the cost of the books that at one time lined the walls of legal offices, which was treated as overhead."). Ransier therefore did not incur the expenses for on-line legal research as a result of the contempt. Thus, although the Objectors did not raise the point, the Court's independent duty to review the Fee Statements prevents the Court from awarding Ransier the $1,860.38 he requests for on-line legal research.

That leaves $2,113.37 of expenses for photocopies, postage and long-distance calls. During the Fee Hearing, Ransier stated that all of those expenses related to the contempt proceeding, not to services performed in connection with the NGP Chapter 7 case in general. But, as noted above, Vorys inadvertently included in the Fee Statements fees that were not incurred as a result of the Fulson Parties' contempt. And Ransier was unable to tie the expenses included in the Fee Statements to any particular services set forth in the Fee Statements. Thus, the Court will assume that the expenses relate to all the fees for which Vorys billed in the Fee Statements, including those that were incurred as a result of the contempt and those that were not.

Given this, counsel for Lowe argued that Ransier's expenses should be reduced in the same proportion that the Court reduces his fees. The entire $1,860.38 ex-

pense amount for on-line legal research is already being disallowed. The Court has not been provided the information that would allow it to determine which of the expenses for photocopies, postage and long-distance calls relate to the reimbursable fees and what part of those expenses relate to non-reimbursable fees. The Court therefore will reduce the remaining $2,113.75 of expenses for photocopies, postage and long-distance calls using the same percentage by which it is reducing Ransier's fees (approximately 2.7%), or by $57. Thus, the Court finds that the amount of expenses incurred as a result of the Fulson Parties' contempt was $2,056.75. In sum, other than the on-line legal research costs and the expenses allocated to non-reimbursable services, the expenses sought by Ransier were incurred as a result of the Fulson Parties' contempt and are reasonable and customary.

## V. Legal Analysis

### A. Fees and Expenses as Sanctions for Contemptuous Conduct

 A "[trial] court ha[s] broad discretion to fashion an appropriate remedy for ... contempt," and "[i]n a civil contempt proceeding, judicial sanctions can be used not only to coerce compliance, but also to compensate the complainant." *Williamson v. Recovery Ltd. P'ship*, 467 Fed. Appx. 382, 396 (6th Cir.2012) (internal quotation marks omitted). In order to recover fees and expenses as compensation for contemptuous conduct, a party must demonstrate that the fees and expenses were incurred as a result of the contempt. *See Ross v. Meyers*, 883 F.2d 486, 491 (6th Cir.1989) ("A compensatory sanction [for contempt of court] must be based upon ... actual losses sustained as a result of the contumacy.") (internal quotation marks omitted); *Liberis v. Craig*, No. 87–5321, 1988 WL 37450, at *8 (6th Cir. Apr. 25, 1988) ("[T]he costs associated with these

appeals were a direct result of the plaintiffs' initial contumacious conduct.... Therefore, we find that the bankruptcy judge did not abuse his discretion by awarding attorneys' fees and expenses incurred by the trustees as a result of the plaintiffs' unsuccessful appeals of the orders holding them in contempt."). As the Court found above, fees in the amount of $89,011.25 and expenses in the amount of $2,056.75 were incurred by Ransier as a result of the Fulson Parties' contempt.

There is a split of authority on the issue of whether courts must use the lodestar method—which calculates the permissible fee based on "the number of hours reasonably expended multiplied by a reasonable hourly rate"—when evaluating a request for fees in the civil contempt context. *Walman Optical Co. v. Quest Optical, Inc*, No. 11–CV–0096, 2012 WL 3248150, at *11 (D.Minn. Aug. 9, 2012) (citing cases on both sides of the issue while following the lodestar method).

The Bankruptcy Appellate Panel of the Sixth Circuit (the "BAP") declined to require the use of the lodestar method in *In re Nicole Energy Services, Inc.*, No. 06–8028, 2007 WL 328608, at *5 (6th Cir. BAP Feb. 1, 2007), but the BAP did not prohibit its use. And the United States District Court for the Southern District of Ohio (the "District Court") has used the lodestar method in the context of a civil contempt sanction. *See Dominic's Rest. of Dayton, Inc. v. Mantia*, No. 09–131, 2009 WL 4680223, at *6 (S.D.Ohio Dec. 3, 2009); *Williamson v. Recovery Ltd. P'ship*, No. 06–292, 2013 WL 3222428, at *9 (S.D.Ohio June 25, 2013). Thus, the Court has employed the lodestar method in making its findings of fact.

 Under this method, the party seeking fees "bears the burden of proving that the number of hours expended was

reasonable," *Williamson*, 2013 WL 3222428, at *9 (citations omitted) (quoting *Gunasekera v. Irwin*, 774 F.Supp.2d 882, 887 (S.D.Ohio 2011)). Ransier carried this burden with respect to fees in the amount of $89,011.25. In fact, "[t]he documentation offered in support of the hours charged [is] of sufficient detail and probative value to enable the [Court] to determine with a high degree of certainty that such hours were actually and reasonably expended[.]" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 552–53 (6th Cir.2008) (quoting *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n. 2 (6th Cir.1984)). "Once a party has established that the number of hours and the rate claimed are reasonable, the lodestar amount is presumed to be the reasonable fee to which counsel is entitled." *Williamson*, 2013 WL 3222428, at *9 (quoting *Gunasekera*, 774 F.Supp.2d at 887). The lodestar accordingly is $89,011.25 plus expenses in the amount of $2,056.75, for a total of $91,068.

**B. The Objections**

■ "Where a party raises specific objections to a fee award, a [trial] court should state why it is rejecting them." *Serv. Master Corp.*, 592 Fed.Appx. at 367 (quoting *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1176 (6th Cir.1990)). The Court will do so here. In addition to the objections discussed above with respect to the time spent on the Stay Notice and Ransier's request to continue the hearing on the Contempt Motion, Lowe's objections to the Fee Statements—which Sanders and the Co-administrators adopt—fall into 14 categories. The Court will address each of those objections, as well as the additional objections made by Sanders and the Co-administrators. As explained below, while the Objectors take

a scattershot approach in the apparent hope that some of the objections will hit the mark, only two do so, and those objections result only in minimal reductions to the requested fees. Most of the objections, including the first 11 discussed below, are completely meritless.

**1. The Lack of Discovery**

■ Lowe begins by noting that Ransier "did not issue a single interrogatory, request for production, or request for admission .... [n]or did [he] take or defend a single deposition." Lowe Objection at 2. But so what? Having reviewed and analyzed the Complaint and the Amended Complaint, there was no need for Ransier to conduct discovery in order for him to determine that the Fulson Parties were in civil contempt. Thus, far from providing a reason to reduce Ransier's fees, this objection instead underscores the point that Ransier exercised appropriate judgment in not asking his counsel to perform unnecessary tasks. The possibility that the amount of the Fee Statements might have been higher if discovery had been necessary provides no reason to reduce the fees that Ransier actually requested. The Court thus will not reduce Ransier's fees based on this objection.

**2. The Clarity of the Law Governing the Court's Finding of Contempt**

Lowe continues by noting that this Court previously held that "the law is neither novel nor in flux, and there is nothing ambiguous about the applicable provisions of the Bankruptcy Code or the language of the OCPA as applied to the NGP Ohio RICO Claims[,]" *Contempt Op.*, 519 B.R. at 754—his suggestion being that it therefore was unreasonable for the Vorys professionals to spend the amount of time they expended combating efforts by the Fulson Parties to assert the NGP Ohio

RICO Claims. Lowe Objection at 2. But the passage from the Contempt Opinion that Lowe quotes was directed at the Fulson Parties, not at Fulson. The point the Court was making was that, under the governing law, the Fulson Parties clearly violated the automatic stay and were in contempt when they commenced and continued the 2013 State Court Case. Yet they persisted in their contempt, requiring Ransier to incur more fees. As the Court repeatedly made clear in the Contempt Opinion, it was the Fulson Parties who were being unreasonable, not Ransier. While the Objectors now attempt to twist the Court's statement in the Contempt Opinion and use it against Ransier, their argument is utterly unpersuasive. No reduction of Ransier's fees will be made based on this objection.

### 3. The Amount of Fees Compared to the Settlement Amount

According to Lowe, "by the time all the appeals are exhausted, the parties' attorneys' fees connected with this contempt may exceed the value of [Ransier's] settlement with the Columbia Gas Entities—the asset this contempt proceeding was ostensibly prosecuted to protect." Lowe Objection at 2. First of all, this statement may well turn out to be false. After all, Ransier's fees and expenses to date approximate only $90,000, while the value of the settlement with TCO was $250,000. But even if the statement proves to be true, it would provide no reason for Ransier to have made a passing attempt to stop the Fulson Parties from engaging in contemptuous conduct and to have then given up when they refused to cease and desist. *See Liberis*, 1988 WL 37450, at *8 ("The trustee was forced to incur these costs to defend the contempt order on appeal, regardless of whether or not the actual contumacious conduct which had given rise to the contempt order had ceased. Therefore, we

find that the bankruptcy judge did not abuse his discretion by awarding attorneys' fees and expenses incurred by the trustees as a result of the plaintiffs' unsuccessful appeals of the orders holding them in contempt.").

Citing *In re Russell*, 441 B.R. 859 (Bankr.N.D.Ohio 2010) and *Harris v. Memorial Hospital (In re Harris)*, 374 B.R. 611 (Bankr.N.D.Ohio 2011), Lowe posits that "the attorney fees requested should bear a reasonable relationship to the amount in controversy and *significant awards of attorney fees are rarely appropriate where the debtor has no other damages besides the attorney fees*" Lowe Objection at 4 (internal quotation marks omitted). While this proposition is true, it is entirely inapplicable here. In both *Russell* and *Harris*, the party alleging damages from the stay violation was a debtor who had not been significantly harmed by the violation, and it therefore made sense that the debtor's attorney should not be permitted to incur significant fees litigating the stay violation. In *Russell*, the debtor's wages had been garnished, but the creditor fully reimbursed the debtor for the garnishments without the debtor's attorney needing to incur substantial fees. *Harris* involved a similar fact pattern. There, the creditor sent two dunning notices, which the court found were transmitted by mistake, and the creditor agreed to refrain from sending more notices even before it was sued by the debtor. By contrast, in awarding over $40,000 of sanctions for ongoing violations of the automatic stay, another bankruptcy court distinguished *Harris*, noting that "[t]he Defendants' actions prior to and during this litigation lead this Court to believe that any attempt to resolve the violations outside of litigation would have been pointless." *In re*

*Henderson,* No. 095114, 2011 WL 1838777, at *7 (Bankr.E D.Ky. May 13, 2011).

Just so here. Because the Fulson Parties persisted in their violation of the stay, Ransier needed to spend considerable time addressing the stay violations in order to protect the settlement with TCO, which will be the source of funds for the distribution to creditors. *See Contempt Op.,* 519 B.R. at 735 ("Because the NGP Ohio RICO Claims were property of NGP's estate and Ransier was settling them, he could not stand idly by once the Fulson Parties filed the 2013 State Court Case."). The Fulson Parties "have caused Ransier to incur expenses that, if not reimbursed, will reduce the distributions to other creditors." *Id.* at 754. Indeed, the Fulson Parties' contempt already has harmed creditors by delaying their distributions. *See In re Royal Manor Mgmt., Inc.,* 525 B.R. 338, 383 (6th Cir. BAP 2015) ("[The bankruptcy court] noted that Grossman's appeals diminished the distribution to holders of allowed claims because the Trustee incurred greater attorney fees and distributions were delayed."). For all these reasons, the Court will not reduce Ransier's fees based on this objection.

### 4. Ransier's Testimony During the Contempt Hearing

Lowe alleges that Ransier "admitted [during the Contempt Hearing that] he could not separate his fees for responding to the contempt from his other fees for administering NGP's estate." Lowe Objection at 3. But this statement grossly mischaracterizes Ransier's testimony during the Contempt Hearing. As discussed above, Ransier explained that he was unable to separate the time spent on the Contempt Motion from services performed

defending the Settlement Motion against challenges that were essentially part and parcel of the contempt—an explanation the Court credited in approving the fees Ransier seeks for defending the Settlement Motion against the objections of Sanders and Fulson. Contrary to Lowe's suggestion, Ransier never testified that he was unable to separate his work on the Contempt Motion from any of his other work administering NGP's estate. In fact, Ransier has for the most part separated his case-administration services from those performed as a result of the Fulson Parties' contempt.[8] This objection is seriously misleading, and no reduction of Ransier's fees will be made based on it.

### 5. Services Performed After the Court Issued the Show Cause Order

Lowe contends that the only fees for which Ransier should be compensated after the Court issued the Show Cause Order are the fees incurred to "prepare for and attend the show cause hearing; and ... file post-hearing memoranda." Lowe Objection at 4. The asserted rationale for this contention is that, once the Show Cause Order was issued, Ransier knew that "there was a high probability of 'reimbursability'" of his fees. *Id.* at 5 (citing *In re Gen. Motors Corp,* 110 F.3d 1003, 1017–18 (4th Cir.1997)). Apparently, the suggestion is that Ransier did more than he needed to do in order to address the Fulson Parties' contempt. But this argument simply will not wash. As already discussed, Ransier declined to conduct any discovery in this case because it was unnecessary for him to do so in order to establish the Fulson Parties' contempt. Ransier's prudence in this regard belies an

---

**8.** The Court has detailed above in Section IV.B.2 the reductions it has made in Ransier's fees due to his inadvertent inclusion of time spent on matters unrelated to the Fulson Parties' contemptuous conduct.

intent to run up the bill unnecessarily. To the contrary, as discussed below, the services to which Lowe specifically objects were all performed as a result of the Fulson Parties' contempt and as part of a reasonable attempt by Ransier to keep the Fulson Parties from engaging in ongoing contemptuous conduct.[9] Thus, no reduction of Ransier's fees will be made based on this objection.

The first category of post-Show Cause Order services to which Lowe objects are those related to the Injunction. Lowe Objection at 5. During the hearing on the Settlement Motion, counsel for TCO stated that TCO would pay the $250,000 settlement amount only upon the satisfaction of two conditions: (1) the Court's approval of the settlement; and (2) the Court's issuance of an injunction enjoining any entity from pursuing derivative claims and/or other claims that are property of NGP's bankruptcy estate. The Court entered the Injunction Notice and later issued the Injunction. *See Settlement & Inj. Order*, 518 B.R. at 443–44. The portion of the Settlement and Injunction Order entitled "The Need for the Injunction" contains, among others, the following findings:

> [T]he Complaint asserted derivative claims against the Columbia Gas Entities that are property of NGP's estate.... Although it ostensibly asserted claims only for damages sustained by NES in Fulson's purported capacity as the owner of NES, the Amended Complaint seems deliberately designed to say enough to permit a later amendment

(once the NGP case is closed) in order for Fulson to re-assert a claim for damages on account of injuries allegedly sustained by NGP.... In the Injunction Notice, the Court stated its intent to enjoin the NGP Ohio RICO Claims if they were judicially determined to be derivative of claims of NGP or otherwise to be property of NGP's bankruptcy estate. *See* Injunction Notice at 2. As noted above, in the companion opinion also issued today, the Court holds that the NGP Ohio RICO Claims are derivative of NGP's claims against the Columbia Gas Entities and are property of NGP's bankruptcy estate. Thus, the prerequisite for enjoining the NGP Ohio RICO Claims has been satisfied.

*Id.* at 440–41.

The Court held in the Settlement and Injunction Order that "Fulson had no right to bring the claims asserted in the 2013 State Court Case—the NES Ohio RICO Claims because they had been sold to TCO and the NGP Ohio RICO Claims because they are property of NGP's estate and are being settled by Ransier"—and that "it is appropriate to enjoin the NGP Ohio RICO Claims and other claims that are property of NGP's estate." *Id.* at 444.

Lowe makes five arguments with respect to the fees related to the Injunction, none of which is meritorious:

**a.** "Even before the [issuance of the Injunction Notice], [Ransier] and his firm had billed 7 hours on matters related to

---

**9.** In *General Motors,* the United States Court of Appeals for the Fourth Circuit adopted a district court judge's report and recommendation to the effect that attorneys' fees incurred by General Motors in an amount exceeding $165,000 were reasonable. The Fourth Circuit did so even though "the Fourth Circuit [had already] stated that GM would recover its attorneys' fees, [so that] there [was] a greater risk of bill inflation as the 'reimbursa-

bility' [was] known before most of the work [was] performed and billed." *Gen. Motors Corp.,* 110 F.3d at 1017. While *General Motors* supports the Court's close scrutiny of Ransier's fees, the decision does not provide a basis for reducing them. Instead, the decision's award of over $165,000 in fees, if anything, provides support for Ransier's fee request.

the Injunction. At a minimum, this time should be disallowed." Lowe Objection at 5 n.6. The fact that Vorys performed services related to the Injunction before the Court issued the Injunction Notice shows only that, as a result of the Fulson Parties' contempt, Ransier and TCO were discussing the need for an injunction even before the Court issued the Injunction Notice. Lowe does not explain why this means that the pre-Injunction Notice fees should be disallowed, and the Court cannot fathom how there could be a tenable basis for doing so based on Lowe's argument.

**b.** Lowe argues that "[t]he Injunction was requested by the Columbia Gas Entities, and the Injunction primarily benefited the Columbia Gas Entities, so the cost for obtaining the Injunction should have been borne by the Columbia Gas Entities." Lowe Objection at 5 (footnote omitted). This argument is contrary to the findings the Court made in issuing the Injunction. In that opinion, the Court found that "the failure to enjoin the NGP Ohio RICO Claims would adversely affect NGP's estate by permitting entities other than Ransier to assert those claims, scuttling the settlement he struck with TCO, to the detriment of NGP's creditors." *Settlement & Inj. Order,* 518 B.R. at 443. Further, as noted above, TCO made the entry of the Injunction a prerequisite to payment pursuant to the settlement. It was Ransier who was seeking approval of the settlement, so it makes sense that Ransier would file a brief in support of the Injunction.

**c.** According to Lowe, "[t]hough [Ransier] expressed concern that the Columbia Gas Entities might back out of the settlement without the Injunction, the Columbia Gas Entities had no basis, under the terms of the settlement, for doing so." Lowe Objection at 5 n.7. As the Court noted in addressing this argument once before,

"Sanders and Lowe [previously] argue[d] that TCO did not have the right to impose th[e] condition [of the entry of the Injunction] after having already reached an agreement with Ransier." *Settlement & Inj. Order,* 518 B.R. at 443. But as the Court has already found, "Ransier did not see it that way; he has agreed to the injunction as a condition of the settlement." *Id.* "If he had not [agreed to the Injunction], then the Court would be faced with having to decide whether the settlement should be enforced against TCO absent the injunction." *Id.* Yet as things stood at the time of the hearing on the proposed settlement, "Ransier ha[d] agreed to the injunction, the settlement with the injunction [was] the only deal on the table, and the Court ha[d] provided adequate notice of the proposed injunction." *Id.* In other words, Lowe's argument is contrary to the Court's prior findings in the portion of the Settlement and Injunction Order approving the Injunction.

**d.** Lowe contends that "if the scope of the OCPA is clear, as the Court determined, the Columbia Gas Entities could have filed a brief motion to dismiss in the State Court Action for a few thousand dollars, rather than backing out of a $250,000 settlement." Lowe Objection at 5 n.7. But in any such motion to dismiss TCO would have pointed out that Fulson asserted claims in the 2013 State Court Case that are property of NGP's bankruptcy estate, and the State Court likely would have declined to adjudicate the issue of whether the claims were property of the estate. In fact, as the Settlement and Injunction Order pointed out,

on February 13, 2013, Ransier filed [the Stay Notice]. In response to the Stay Notice, the State Court entered an order ("Stay Order") providing that "[i]t appearing that this case has been stayed by the U.S. Bankruptcy Court . . . this

case is designated inactive pending further order of the Bankruptcy Court, or by motion of a party herein to proceed in a manner not stayed by that Court." Stay Order at 1. This Court did not and has not issued any order lifting the automatic stay, and Fulson never filed a motion 'to proceed in a manner that is not stayed. . . .' Instead, despite the Stay Order, Fulson filed [the Amended Complaint].

*Settlement & Inj. Order*, 518 B.R. at 440. This argument is yet another nonstarter.

e. Lowe argues that "[t]he Injunction was not issued to correct the contemptuous conduct; in fact, the Injunction was only necessary .because the Columbia Gas Entities were concerned that the Objectors would engage in *non-contemptuous* conduct (litigating the State Court Action after the close of the case) in the future." Lowe Objection at 5. Lowe's argument boils down to this: the automatic stay will expire upon the closing of the NGP case; the Fulson Parties would not have been in contempt once the NGP case closed if Ransier had not obtained the Injunction; and Ransier therefore cannot be compensated for obtaining the Injunction. But the conclusion does not follow from the premises. As the Court previously found, the Fulson Parties were engaging in contemptuous conduct when they sought to exercise control over property of NGP's bankruptcy estate by asserting the NGP Ohio RICO Claims. Ransier sought and obtained the Injunction in order to protect the estate's interests in the NGP Ohio RICO Claims, and he did so as a result of the Fulson Parties' contemptuous assertion of the NGP Ohio RICO Claims in the 2013 State

Court Case. No reduction of Ransier's fees will be made based on the objections related to the Injunction.

### 7. The Effect of Fulson's Death

■ Lowe argues that he should not be held liable for the fees Ransier incurred analyzing the impact of Fulson's death on the contempt proceedings because those fees were "not a foreseeable consequence of the contempt." Lowe Objection at 6. Whether fees must be foreseeable before they may be awarded as a sanction for contempt is open to debate.[10] But assuming for the sake of argument that foreseeability is a prerequisite to reimbursability, Lowe's objection nonetheless is unavailing for the simple reason that the need to analyze the effect of Fulson's death on the contempt proceeding was a foreseeable result of the Fulson Parties' contempt.

As the Court previously held, "the Fulson Parties violated the automatic stay and were in contempt of Court when they commenced *and continued* the 2013 State Court Case." *Contempt Op.*, 519 B.R. at 755 (emphasis added). In other words, the substitution of the Fulson Estate as the plaintiff in the 2013 State Court Case in and of itself was contemptuous, and at that point a quite foreseeable consequence of that contempt was that Ransier would need to analyze the ramifications of Fulson's death and the substitution of the Fulson Estate. In his reply, Ransier provides more detail than he did in the time entries as to the nature of the research conducted in this regard. The Vorys professionals undertook "efforts to ascertain and verify: (a) the identity of Mr. Fulson's legal successor-in-interest, (b) the nature

---

**10.** *See Flagler v. Hous. Auth. of Sanford, Fla.,* No. 90–878, 2008 WL 785937, at *4 (M.D.Fla. Mar. 20, 2008) ("While the public policy underlying tort law may favor a tradeoff between compensation and reasonable limits on liability, the policy underlying the use of re-

medial contempt sanctions is skewed in favor of the injured party. Accordingly, the measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.").

and extent of the interest succeeded to, (c) the authority of and means of exercise of authority by the individual or entity succeeding to Mr. Fulson's interest, and (d) if a contempt order were issued, the proper means and timing for filing a claim against the Fulson estate." Ransier Reply at 3. At the time Fulson died, an agreed order effectuating Fulson's withdrawal of his proof of claim had already been entered, Doc. 165, and no matter other than the Contempt Motion was pending at that time that would have been affected by Fulson's passing. Thus, when Ransier spent time analyzing the effect of Fulson's death, it was the effect on the Contempt Motion that he would have been analyzing. So no reduction of Ransier's fees is warranted based on this objection.

### 8. The Need to Monitor the NES Case

Lowe further argues that Ransier should not be able to bill "for keeping abreast of the developments in the NES case." Lowe Objection at 4; *see also id.* at 6. But the need to monitor the NES case after it was reopened in response to the filing of the 2013 State Court Case arose as a result of the Fulson Parties' contempt. As Ransier stated in his reply, the only entries included in the Fee Statements related to NES "are those entries specifically tied to arguments raised by the Fulson Parties *in both the NES and NGP proceedings.*" Ransier Reply at 3. Ransier "was required to monitor the NES proceeding to address any potential concerns regarding issue preclusion, contrary positions taken by the Fulson Parties, or judicial estoppel." *Id.* Accordingly, this objection does not provide a tenable basis for a reduction of Ransier's fees.

### ·9. Lowe's Purported Settlement Efforts

Lowe represents to the Court that "in October 2013, counsel for Lowe attempted to resolve this matter by offering to pay [Ransier's] attorneys' fees and had requested information pertaining to the amount accrued through that date[,]" Lowe Objection at 7, but that because Ransier "fail[ed] to provide information relating to outstanding fees after such a settlement request was made, thereby allowing the parties to engage in settlement discussions, he should be precluded from recovering fees after that offer." *Id.* In his reply, Ransier states:

> [T]he "offer" presented consisted solely of a soft-inquiry inviting the Trustee to negotiate with counsel for Lowe with respect solely to fees incurred by the Trustee through October 2013—this "offer" did nothing to address the very real and substantive contempt issues fully addressed in the ultimate Contempt [Opinion]. No reasonable offer, and indeed no offer on behalf of all of the Fulson Parties, was ever presented to the Trustee so as to support an argument that the Trustee failed to mitigate his damages.

Ransier Reply at 4.

Ransier's testimony during the Fee Hearing was consistent with this statement. As Ransier testified, no settlement was possible unless the Fulson Parties agreed that Fulson had no right to continue to pursue the 2013 State Court Case, an agreement they were unwilling to make. No reduction of Ransier's fees will be made based on this objection.

### 10. Ransier's Delegation

Lowe also contends that the Fee Statements should be reduced because Ransier did not properly delegate. Lowe Objection at 10 ("In this case, 166.2 hours were performed by attorneys that are partners

or are of-counsel (Mr. Ransier, Mr. Swift, and Ms. Bowers), while only 77.8 hours were billed by attorneys that are associates (Ms. Giberson and Ms. Fromme).").
To be clear, Ransier billed only 27.30 hours in the First Fee Statement and 5.10 hours in the Second Fee Statement; Swift billed just one hour, for time related to analyzing the effect of Fulson's death and the substitution of the Fulson Estate. The objection therefore essentially relates to the time spent by Bowers, who billed 137.90 hours in the First Fee Statement and 49.10 hours in the Second Fee Statement.

According to the Objectors, rather than Bowers researching and writing at $285 per hour, the work instead should have been done by one of the associates, including Fromme at $210 or $230 per hour (depending on Fromme's rate at the time). This might be a winning argument in those instances where partners have performed work that junior associates could have handled. See Shannon v. Fireman's Fund Ins. Co., 156 F.Supp.2d 279, 301–02 (S.D.N.Y.2001) (35% reduction based on, among other things, a senior partner with 40 years' experience billing $315 for legal research and writing that associates could have done at a rate of $180–200 per hour). But the argument holds no water where, as here, the objection is that an associate should have done the work rather than of-counsel who is only billing $55 to $70 more per hour than one of the associates and the same as the rate charged for one of the other associates, Giberson. There simply is no issue with Bowers performing services rather than a senior associate when Bowers was billing at the same rate as the associate. See Adusumelli v. Steiner, 2013 WL 1285260, at *4 (S.D.N.Y Mar. 28, 2013) ("Defendants seek to reduce the fee request because Jeffrey A. Wadsworth, currently a Partner at Harter Secrest, conducted a significant amount of legal research.... [W]hen Wadsworth himself conducted most of the research in this case, he was an associate, not a partner.... Thus, the Court declines to reduce the fee request on this basis.").

In addition, Ransier pointed out during the Fee Hearing that it would have made little sense for him to rely heavily on a junior associate such as Fromme when the Fulson Parties were well-represented by several seasoned attorneys. As Ransier says in his reply:

> Mr. Lowe inexplicably concludes that Ms. Bowers' designation as "of counsel" makes her a "top-heavy" biller, notwithstanding the fact that Ms. Bowers' rate is identical to associate Ms. Giberson's rate and nearly $100 less than partner billing rates. Mr. Lowe concedes that "work is to be performed by the person with the lowest billing rate who is competent to perform such services," then argues that more of Ms. Bowers' work should have been delegated to Ms. Giberson (an associate with the exact same billing rate as Ms. Bowers) or Ms. Fromme (a significantly junior associate).... Not only does Ms. Bowers' specialized bankruptcy litigation experience weigh heavily against concluding that more of Ms. Bowers' work was required to be delegated to Ms. Giberson or Ms. Fromme, Mr. Lowe glosses over the fact that delegation of work to associate Ms. Giberson (billable rate of $285) from of-counsel Ms. Bowers (billable rate of $285) would have resulted in precisely the same Fee Statement.

Ransier Reply at 7. Ransier's testimony during the Fee Hearing was consistent with this statement. At the risk of sounding like a broken record, no reduction of Ransier's fees will be made based on this meritless objection.

#### 11. Ransier's Billing Judgment

Although Lowe questions Ransier's billing judgment, Lowe Objection at 12, Ransier in fact exercised commendable billing judgment. In fact, the Court "is surprised that [Ransier's] fees were not higher given the conduct of the [Fulson Parties]." *Rockland Credit Fin., LLC v. Ceda Mills, Inc (In re Ceda Mills, Inc.),* No. 04–24452JAD, 2009 WL 8556804, at *7 (Bankr.W.D.Pa. Feb. 11, 2009). The Objectors' conduct, which is described in detail in the Contempt Opinion, and the scattershot quality of their objections to the Fee Statements, demonstrate that it is the Objectors who have failed to exercise proper judgment. The Court thus will not reduce Ransier's fees based on this objection.

#### 12. Block Billing

■ Turning to the manner in which the Vorys professionals kept time, Lowe objects to their use of block billing, which Lowe describes as "the practice by which a timekeeper aggregates all the timekeeper's separate tasks for a single day into one entry." Lowe Objection at 8. Indeed, "[b]lock billing is the practice of lumping multiple tasks into a single entry of time such that the billing entry does not delineate how hours were allotted to specific tasks." *Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins. Co.,* No. 11–2714–JAR, 2015 WL 866902, at *15 (D.Kan. Mar. 2, 2015) (internal quotation marks omitted), *appeal docketed,* No. 15–3070, —— Fed.Appx. ——, 2015 WL 6685302 (10th Cir. Apr. 1, 2015).

Lowe contends that Vorys's use of block billing prevents the Court from properly assessing the reasonableness of the request for fees and requires a 20% across-the-board reduction in the requested fees. Lowe Objection at 8–10. Lowe's counsel, Rick Ashton ("Ashton"), vigorously pursued this objection during the Fee Hearing, stating that "[w]hen we were reviewing [the First Fee Statement] we would try to determine, okay, how much is or should be compensable? Because if I could come here to you, Judge, saying we think this is an appropriate amount, we would have. The block billing in this case made it impossible." And Ashton confirmed that he was advocating for a 20% across-the-board reduction of Ransier's fees based on the block billing.

■ Block billing is not the optimal method for billing time.[11] But an across-the-board reduction is not called for here; reducing the fees by 20% (or approximately $18,000) would be using an ax when a scalpel is required. Instead, as explained below, a reduction of the Fee Statements by only $159.50 is warranted based on block billing. As counsel for Lowe conceded during the Fee Hearing, block billing "in and of itself is not improper in the attorney fee context." *Williamson,* 2013 WL 3222428, at *11.[12] And the manner in

---

11. The Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, adopted by the Executive Office for United States Trustees, provide that services set forth in time entries "should be noted in detail and not combined or 'lumped' together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimis amount of time can be combined or lumped together if they do not exceed .5

hours on a daily aggregate." 28 C.F.R. pt. 58, App. A ¶ (b)(4)(v).

12. *See also Serv. Master Corp,* 592 Fed.Appx. at 371 ("Regarding block-billing, this court has held that so long as the description of the work performed is adequate, block-billing can be sufficient."); *Armstrong v. Receivables Performance Mgmt., LLC,* 2:11–CV–0387, 2012 WL 404893, at *3 (S.D.Ohio Feb. 8, 2012) ("Block-billed entries are not improper in the attorney fee context."); *United States ex rel.*

which Ransier billed time for multiple tasks on a single day is consistent with the method of billing that counsel for trustees and debtors in possession have used in many other cases in this District.[13] The practice does not warrant a downward adjustment where, as here, the Court is able to "review[ ] the[ ][fee] statements ... [and] counsels' declarations and testimony, and is able to ascertain the compensable work within the block billing." *Williamson*, 2013 WL 3222428, at *11.

Here, the Court is able to ascertain the compensable work within the block billing for two reasons. First, the vast majority of entries that include block-billed time are entries for which all of the time is compensable. This includes entries to which Lowe objects, such as number 21, that include time for reviewing and revising services lists. Although the actual preparation of a service list should not require attorney time, it is an appropriate use of attorney time to review and revise the service list, especially in light of the importance of proper service and the fact that an attorney signs the certificate of service. The remainder of the time billed in entry number 21 is for reviewing and revising the Contempt Motion, making the entirety of it compensable, which again is true of most entries that include block-billed time.[14] And in the few instances where this is not true, the Court is permitted to estimate the compensable and the noncompensable time. *See Armstrong*, 2012 WL 404893, at *3. In *Armstrong*, the District Court found that "out of an entry

---

*MacKay v. Touchstone Research Labs.*, No. 1:04cv327, 2009 WL 3150385, at *4 (S.D.Ohio Sept. 30, 2009) ("Counsel has identified the general subject matter of each entry and included the time expended, and information to identify which attorney or other staff member billed the time. The information is sufficient, even if the billing descriptions are not explicitly detailed. Consequently, the Court declines Defendant's invitation to adjust downward the hours claimed based on vague entries and/or block billing." (citations omitted)).

13. In fact, as the Court pointed out during the Fee Hearing, Ashton is a member of a law firm that consistently employed the practice of block billing in invoices it submitted to the Court in another bankruptcy case. On April 15, 2015—while Lowe's objection to Ransier's fee request was already pending—Ashton's firm submitted invoices in support of a final application for approval of nearly $800,000 of fees incurred in a Chapter 11 case in which the firm represented the debtor in possession. No objections were lodged to the fee application, and the Court approved it after fulfilling its independent duty to review the application. But if the Court had applied to his firm's fee application the 20% across-the-board reduction for which Ashton is advocating here based on block billing, the Court would have reduced his firm's fees by approximately $160,000. When the Court inquired

about this, Ashton stated that he was "ill-prepared to discuss what's happening in another case at [his] law firm that [he was] not working on." As it turns out, Ashton himself billed 70.30 hours of time in the case to which the Court was referring. And when performing multiple tasks on the same day in that case, Ashton regularly utilized the practice of block billing. For example, he billed his client 1.50 hours for "Continued drafting Rule 30(b)(6) notice of deposition; conference with Attorney Pfefferle; review of pertinent documents relating to subject matter of 30(b)(6)" and 7.40 hours in a single day using the following description: "Conducted research regarding possible tax implications with respect to client bankruptcy proceedings; conference with Attorney Stovall and Attorney Allen [two other partners in the firm]."

14. The Court interprets time entries stating that a document was prepared "for service and filing" to mean preparing a document that needs to be filed and served, not performing clerical-type work that needs to be done as a precursor to filing and service, making the fees incurred for those services compensable. Thus, Lowe's objections to Entries 55, 111, 261 and other similar entries are overruled.

totaling 0.50 hours for 'Prepared Summons, Civil Cover Sheet, and initiating documents; filed Complaint and initiating documents with the Court,' 0.10 hours (or six minutes) is a logical portion of that time spent on filing the complaint and initiating documents with the Court." *Id.* Making those estimates, the Court sets forth below the reductions related to block billing:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|---|---|---|---|---|
| 33 | 2/14/13 | Tobin | Draft, file, and Serve Supplemental 21 Day Notice to Show Cause—.80 | .20 × $170[15] = ($34) |
| 99 | 6/28/13 | Bowers | Reviewed motions filed by Columbia Gas and updated file—.70 | .20 × $285 = ($57) |
| 248 | 2/15/14 | Bowers | Reviewed brief in support of injunctive relief filed by Columbia Gas as related to compromise and updated pleadings index with the same—.40 | .10 × $285 = ($28.50) |
| 319 | 10/10/14 | Tobin | Preparation of Exhibits in Support of Fee Statement, finalize and file fee statement—.50 | .10 × $125 = ($12.50) |
| 397 | 6/11/15 | Tobin | Finalize and file agreed order following telephone status conference—.20 | .10 × $125 = ($12.50) |
| 420 | 7/14/15 | Walkuski | Finalize and file Reply in Support of Chapter 7 Trustee's Statement of Damages Pursuant to Contempt Order —.50 | .10 × $150 = ($15) |

**Subtotal: $159.50[16]**

[**Editor's Note:** The preceding image contains the reference for footnotes [15, 16]]

## 13. Intra-office Conferences

According to Lowe, Ransier billed for excessive conference time, warranting an across-the-board reduction in the Fee Statements of 5%. Lowe Objection at 10. As Lowe concedes, "[t]here is no per se prohibition against awarding compensation for intra-office conferences." *In re Moss*, 320 B.R. 143, 158 (Bankr. E.D.Mich.2005). Fees for intra-office conferences generally are allowed if: (1) "the fee application contains sufficient information to permit the court to evaluate the necessity of the service provided, the reasonableness of the time spent on the service, and the reasonableness of the fee charged for the service—including the

---

**15.** The rate stated for Tobin in the Second Fee Statement was $125 rather than the $170 rate listed in the First Fee Statement. As noted above, the parties stipulated that the rates used in the First Fee Statement are reasonable, standard and customary.

**16.** The reduction in the time for entries 33, 319, 398 and 421 is for filing the documents and effectuating service; the reduction in time for entry 99 is for updating the file; and the reduction in time for entry 248 is for updating the pleadings index.

need for a conference;" and (2) "the court finds that such conferences were necessary and benefited the estate." *Id.* (internal quotation marks omitted). In *Moss,* the bankruptcy court found that "the time entries relating to intra-office conferences do contain sufficient detail for the Court to determine that they were necessary and beneficial to the administration of the bankruptcy case" where "[t]hey contain the names of the attorney[s] involved in the conference . . . and the specific issue(s) discussed in the conferences." *Id.* The *Moss* court also noted that "the time spent in each conference was minimal." *Id.*

 Applying the standards used in *Moss,* the Court finds that, although there are instances in which two or more attorneys billed for the same conference with one another, the time billed for such conferences is relatively minimal and appropriate. One Vorys attorney would sometimes bill for a conference with a second attorney, but the second attorney did not bill for the time; the Court did not count that time as being subject to Lowe's objection—after all, Lowe specifically stated that he lodged this objection "[b]ecause [Ransier] consistently billed the time of multiple attorneys in conferences without justifying this duplication. . . ." Lowe Objection at 11. Again, while some of the time that includes conference time is lumped with other time, the Court is permitted to estimate the time spent on particular matters, including the intra-office conferences.

The Court's estimate of the time billed by two or more attorneys for intra-office conferences in the First Fee Statement is approximately 10 hours out of 251.60 total hours billed, and the Court's estimate of the time billed by two or more attorneys for intra-office conferences in the Second Fee Statement is approximately 6.50 hours out of 81 total hours billed. That adds up to approximately 16.50 hours out of 332.60 hours, or approximately 5% of the total time billed. It is difficult to understand, then, how Lowe can contend in good faith that "a substantial portion of the fee request is for conference time[.]" Lowe Objection at 11. Because the time billed by more than one attorney for the same intra-office conference is not inordinate, no reduction of Ransier's fees will be made based on this objection.

### 14. Clerical Time

Lowe asserts that the Fee Statements must be reduced by fees billed for clerical time. *See* Lowe Objection at 12 & n.9 ("The Billing Records reflect that Mr. Tobin, a paralegal, spent approximately 4.6 hours finalizing and filing documents with the Court. Entries 28, 57, 112, 208, 247, 263. [Ransier] cannot recover fees for clerical services, even if those clerical services are performed by paralegal. . . . Mr. Tobin also appears to have billed twice for finalizing, filing, and serving the motion to show cause and suggestion of stay. Entries 25 & 28." (footnote omitted)).

The entries about which Lowe complains are reproduced below. First, Lowe objects to entry number 25:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|-----|------|-------------|----------------------------------|------------------------------|
| 25 | 2/12/13 | Tobin | Finalize Exhibits to file along with Motion to Show Cause. Finalize and file Motion to Show Cause and Notice of Bankruptcy and Suggestion of Stay— 1.70 | $0 |

None of this entry could have been for the filing, because the Contempt Motion was not filed until February 13, 2013. The six exhibits to the Contempt Motion totaled approximately 216 pages. The exhibits were documents that had already been prepared (e.g., the state court Complaint and the Stay Notice), so finalizing them would only have entailed ensuring they were the right documents and that they were in the proper order. But the time billed by Tobin also includes work on the Contempt Motion itself. Accordingly, the Court concludes that the entire 1.70 hours was necessary and appropriate.

As set forth below, however, Tobin did bill for time spent finalizing and filing documents. Lowe relies on three cases from the District Court holding that time spent filing documents cannot be billed. *See Armstrong*, 2012 WL 404893, at *3 ("Filing documents with the Court and mailing documents are not activities sufficiently complex to require the professional training of a paralegal."); *Abernathy v. Corinthian Colleges, Inc.*, No. 2:10–CV–131, 2014 WL 4272723, at *16 (S.D.Ohio Aug. 29, 2014); *Ohio Right To Life Soc., Inc. v. Ohio Elections Comm'n*, No. 2:08–CV492, 2013 WL 5728255, at *21 (S.D.Ohio Oct. 22, 2013).[17] Again, the Court may estimate the compensable and the non-compensable time.

As the Ransier Reply states, finalizing a document for filing includes "non-clerical work required to finalize a document in accordance with local court rules and procedures to ensure proper service." Ransier Reply at 8. And as Ransier pointed out in his testimony, "filing is probably the least of the task." This view is consistent with case law from the District Court. *See Armstrong*, 2012 WL 404893, at *3 ("The Court finds that out of an entry totaling 0.50 hours for 'Prepared Summons, Civil Cover Sheet, and initiating documents; filed Complaint and initiating documents with the Court,' 0.10 hours (or six minutes) is a logical portion of that time spent on filing the complaint and initiating documents with the Court."). In light of *Arm-*

**17.** There is contrary authority. *See Peavler v. Law Firm of Krisor & Assocs.*, 49 F.Supp.3d 535, 541 (S.D.Ind.2014) ("Travel to the post office to mail documents, like travel to and from court for the purpose of filing a complaint, is traditionally counted as part of a law firm's administrative clerical work—and will be considered so in this case. However, time spent filing a complaint is unlike administrative clerical work...."); *Williams v. Z.D. Masonry, Corp.*, No. 07–C–6207, 2009 WL 383614, at *5 (N.D.Ill. Feb. 17, 2009) ("In light of the problems that can result from a botched electronic filing, the court will not second-guess the firm's decision that such filing must be overseen by a paralegal."); *Annuity, Pension, Welfare & Training Funds of Int'l Union of Operating Eng'rs, Local 14–14B, N. Am. Iron Works, Inc.*, No. 07–CV–2257, 2008 WL 4724507, at *4 (E.D.N.Y. Oct. 24, 2008) (finding $285 per hour for an attorney's substantive legal work and $70 per hour for that attorney's administrative work—including electronic filing, mailing papers to opposing counsel and scheduling meetings—was reasonable); *McCullough v. Astrue*, 565 F.Supp.2d 1327, 1332 (M.D.Fla.2008) ("Paralegal services for Plaintiff's case involved electronic filing, work that is neither clerical nor secretarial in nature.").

*strong* and the other District Court decisions cited above, the Court will reduce the Fee Statements on account of the filing of documents as follows:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|---|---|---|---|---|
| 28 | 02/13/13 | Tobin | Finalize, file and serve Motion to Show Cause and Notice of Suggestion of Stay—2.10 | .10 × $170 = ($17) |
| 57 | 03/04/13 | Tobin | Finalize and file Chapter 7 Trustee's Reply in Further Support of Order to Show Cause—.50 | .10 × $170 = ($17) |
| 112 | 09/24/13 | Tobin | Finalize and File Trustee's Request for Hearing and or Joint Scheduling Related to Motion to Show Cause—.90 | .10 × $170 = ($17) |
| 208 | 01/30/14 | Tobin | Finalize and upload proposed order to show cause—.20 | .10 × $170 = ($17) |
| 247 | 02/13/14 | Tobin | File Trustee's Final Trial Brief/Closing Argument and Brief in Support of Issuance of Injunction—.40 | .40 × $170 = ($68) |
| 263 | 03/06/14 | Tobin | Finalize and file Reply Brief in Support of Issuance of Injunction; Reply Brief/Closing Argument—.50 | .10 × $170 = ($17) |

**Subtotal: $153**

In addition, the Court will reduce the fees billed in the Second Fee Statement for clerical time as follows:

| No. | Date | Time-keeper | Time Description and Hours Billed | Reduction in Time and (Fees) |
|---|---|---|---|---|
| 352 | 2/24/15 | Bowers | Nicole Services appeal and certification reviewed, and updated file—.40 | .10 × $285 = ($28.50) |
| 399 | 6/22/15 | Bowers | Updated file with supplemental certificate of service for statement of fees—.10 | .10 × $285 = ($28.50) |
| 405 | 7/01/15 | Bowers | Updated pleadings index with co-executors objection to statement of fees—.10 | .10 × $285 = ($28.50) |

**Subtotal: $85.50**

In sum, based on this objection, the Court reduces as clerical time .10 hours from each of entry numbers 28, 57, 112, 208, 263 and 352, plus the entirety of entries 247, 399 and 405, for a total reduction for clerical time of $238.50.

### 15. The Additional Objections by Sanders and the Co-administrators

For the reasons explained below, no reduction of Ransier's fees will be made based on the additional objections to the Fee Statements asserted by Sanders and the Co-administrators. Sanders begins by citing decisions in which approximately $1,000 or less was awarded for violations of the automatic stay and then argues that "[t]he reason that [Ransier's] damage request is so out of line with the mainstream is shown in the objections filed by James A. Lowe." Sanders Objection at 1; *see also* Co-administrators Objection at 3 ("We do not see any application or award even remotely close to what [Ransier] seeks. Time and again the awards are only several hundred or, at most, several thousand dollars."). Each of the decisions on which Sanders and the Co-administrators rely involved improper collection or repossession activity that did not significantly injure the debtor and that was addressed without protracted litigation. But the only thing those decisions have in common with this case is that they involved a violation of the automatic stay. As explained above, rather than involving a violation of the stay that was resolvable without significant litigation, the NGP case involves an unremitting attempt by recalcitrant parties attempting to exercise control over property of the estate for their own gain and to the detriment of unsecured creditors of the estate.

While the authorities cited by Sanders are wholly inapposite, decisions rendered in cases that more closely resemble the fact pattern here support the reasonableness of the five-figure compensatory sanction the Court is awarding Ransier. *See Henderson*, 2011 WL 1838777, at *7 (awarding over $40,000 for repeated violations of the automatic stay that were still ongoing because "[t]he Defendants' actions prior to and during this litigation lead this Court to believe that any attempt to resolve the violations outside of litigation would have been pointless"); *In re Sayeh*, 445 B.R. 19, 30 (Bankr.D.Mass.2011) (awarding more than $51,000 of fees and expenses in favor of Chapter 11 trustee and against debtor on account of debtor's exercising control over property of the estate in violation of the automatic stay); *Henkel v. Lickman (In re Lickman)*, 297 B.R. 162 (Bankr.M.D.Fla.2003) (awarding more than $78,000 in legal fees and costs that Chapter 7 estate incurred in addressing defendants' attempts to exercise control over property of the estate).

Sanders takes the position that Ransier's attorneys' fees and expenses should be "limited to the 'amount that would have been incurred if the matter had been resolved in a nonlitigious manner.'" Sanders Objection at 4 (quoting *In re Price*, 179 B.R. 70, 71 (Bankr.S.D.Ohio 1995)); *see also* Co-administrators Objection at 2. Given the intransigence of the Fulson Parties (and now the Fulson Estate), the matter was not susceptible to resolution in a nonlitigious manner; in fact, the Objectors are continuing to litigate, warranting higher attorneys' fees than the cases on which they rely.[18]

---

**18.** Sanders and Lowe both sound the theme of Ransier's purported litigiousness in their objections. They maintain that if Ransier had taken a more conciliatory approach in responding to the contemptuous conduct of the Fulson Parties, the total amount of attorneys' fees and expenses he incurred would have been much lower. But this argument rings hollow given that Ransier was forced to counter the Fulson Parties' continuous and unrelenting effort to assert control over claims that belonged to the bankruptcy estate of NGP. And the contention that Ransier should have addressed the violation of the automatic stay in a less vigorous manner is vexing given that Lowe and Sanders—without

Sanders contends that "[i]f this Court determines that the fees incurred in obtaining the [I]njunction are proper, it should assess only those fees as damages. The [I]njunction made any other action unnecessary." Sanders Objection at 10 n.3. This contention simply is flatly wrong, and Sanders does not even make a passing attempt to explain why he believes it to be true. Sanders makes several additional arguments that the Court has already rejected. He argues that the Court could have approved the Settlement Motion without also entering the Injunction, an argument that, as discussed above, the Court has previously found to be meritless.

Sanders maintains that "[t]here was no need for [Ransier] to resort to litigation" because "[w]hen the Fulson Parties learned that [Ransier] believed the OCPA action violated the automatic stay they promptly filed an amended OCPA complaint in state court ... show[ing] the willingness of the Fulson Parties to cure the alleged violation, notwithstanding their belief that none had occurred." Sanders Objection at 4. Yet this is contrary to both of the Court's earlier decisions—the Contempt Opinion and the Settlement and Injunction Order. *See Contempt Op.*, 519 B.R. at 734 ("[T]he Court's review of the Amended Complaint validates Ransier's view that it appears deliberately designed to say enough to permit (once the NGP case is closed) a further amendment that seeks damages based on harm allegedly suffered by NGP. And it appears that this was the Fulson Parties' intent."); *Settlement & Inj. Order*, 518 B.R. at 444 ("[T]he Amended Complaint seems deliberately designed to say just enough to permit a later amendment—once the NGP case is closed—in order to re-allege damages to Fulson based on injuries purportedly suffered by NGP. And it appears that such an amendment was the intent, as evidenced by the Injunction Response.... [E]ven after Fulson filed the Stay Notice, and after the State Court entered the Stay Order and this Court entered [the Show Cause Order,] Sanders and Lowe have persisted, going so far as to oppose the injunction that is a prerequisite to TCO's willingness to consummate the settlement with Ransier and then, just recently, substituting Fulson's probate estate as the plaintiff in the 2013 State Court Case.").

Sanders further contends that the NGP Ohio RICO Claims were no longer property of NGP's bankruptcy estate once the Court approved Ransier's compromise with TCO. Sanders Objection at 4–5 & n.1. Ransier, however, did not sell the NGP Ohio RICO Claims to TCO—he settled them. The Court's approval of the settlement resulted in Ransier's release of NGP's claims against the Columbia Gas Entities, but did not render the claims property of any entity other than NGP's bankruptcy estate. Put differently, if Ransier attempted to sue the Columbia Gas Entities at this point, the appropriate response would be that the settlement ap-

---

any apparent sense of irony—objected to the Fee Statements on more than two dozen grounds. Their position is particularly irksome considering that only two of their objections had any merit whatsoever and that those two objections resulted in a mere $398 reduction of the fees requested in the Fee Statements (a reduction of less than one-half of one percent of the total fees Ransier requested). "This scattershot approach is the antithesis of sound advocacy." *Max M. v. New Trier High Sch. Dist.*, 859 F.2d 1297, 1300 (7th Cir.1988). *See also Black Radio Network, Inc. v. Nynex Corp.*, 44 F.Supp.2d 565, 588 (S.D.N.Y.1999) (decrying "kitchen-sink approach to litigation"); *Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC*, No. 4:11CV1299 RWS, 2014 WL 793732, at *1 n. 2 (E D.Mo. Feb. 27, 2014) (criticizing litigant's " 'throw everything against the wall and see what sticks' approach to litigation").

proved by the Court prohibited him from pursuing the claims on behalf of NGP's bankruptcy estate—not that the claims were no longer property of the estate. Furthermore, in addition to constituting a violation of the automatic stay, the continuation of the 2013 State Court Case would violate the Settlement and Injunction Order—which, as noted above, the Fulson Parties did not appeal despite its status as a final order.

Sanders also argues that the Fee Statements should be reduced because

> [i]n considering the amount of damages that should be awarded for a stay violation, a bankruptcy court should consider "(1) whether the injury caused, and the damage incurred, other than attorney fees, only amount to the cost of appearing in court to litigate the contempt motion; (2) whether the burden of requiring Debtor's attorney to notify the Creditor of the violations is insignificant; and (3) whether the offending creditor acted in bad faith."

Sanders Objection at 2 (quoting *In re Price*, 179 B.R. 70, 71 (S.D.Ohio 1995)). This argument is not well-taken. As to the first *Price* factor, the injury in the NGP case amounts to more than "the cost of appearing in court to litigate the contempt motion"—as already explained, it also includes the delay creditors have experienced in receiving their distributions, as well as a reduction in those distributions if Ransier's attorneys' fees are not paid by the Objectors. Nor does the second *Price* factor support Sanders's position. While the burden of requiring Ransier to notify the Fulson Parties of the violation of the stay would have been relatively "insignificant," as already discussed, doing so would have been completely unavailing. *See Contempt Op.*, 519 B.R. at 754 ("While it is true that parties seeking to redress violations of the automatic stay

should do so without incurring any more expense than is necessary ... the telephone calls suggested by Sanders and Lowe clearly would have been ineffectual here."). The third factor also weighs against Sanders. The question of whether the stay violator "acted in bad faith" is definitively answered in the affirmative when the stay violator refuses to stop engaging in the stay violation—as the Fulson Parties did here. Further, as explained in the Ransier Reply, Sanders has the burden of proving that he was not acting in bad faith under *Price*, and he has simply not done so.

The Court questioned Sanders's good faith in the Contempt Opinion and in the Settlement and Injunction Order. And the arguments asserted by Sanders in his current objection have done nothing but underscore the Court's doubts about his credibility. In the Contempt Opinion, the Court stated as follows:

> During his testimony, Sanders suggested that he was aware of and relied upon *Adair v. Wozniak* ... while he was in the process of deciding whether filing the Complaint would violate the automatic stay. Tr. at 74–75. He left this impression even though he mentioned *Adair* for the first time in the Sanders Motion, having failed to cite it in the first three documents he filed in this matter, the Fulson Parties Response, their Surreply and the document containing supplemental case law authority. This also calls his credibility into question.

*Contempt Op.*, 519 B.R. at 735.

Sanders attempts to rehabilitate his credibility on this point, stating that:

> There was no reason for the Fulson Parties to cite *Adair* in opposing the Trustee's show cause motion. *Adair* applied the common law rule that only a corporation (not its equity holder) has

**236**

standing to sue for injuries the corporation. The common law rule in *Adair* has no application to standing under the OCPA.... Sanders cited *Adair* in his Final Trial Brief and Closing Argument [Doc. 182] because, on rereading *Adair*, he found language suggesting that the common law rule discussed in it does not apply in cases of indirect injury. The fact that Sanders did not discuss *Adair* in the pre-hearing briefs does not support a finding that Sanders believed the OCPA action would violate the automatic stay.

Sanders Objection at 7 (citation omitted).

This explanation makes no sense in light of Sanders's testimony during the Contempt Hearing, at which he was asked whether there was "a particular Ohio Supreme Court case that [he] used to help make [his] determination as to this indirect injury[.]" Hr'g Tr. at 74. The context of the question was Sanders's decision to file the 2013 State Court Case based on his purported belief that doing so would not violate the automatic stay. Answering the question, Sanders said that he was aware of *Adair*'s description of "the nature of the injury to the shareholder as an indirect injury." Hr'g Tr. at 75. In other words, during the Contempt Hearing, Sanders suggested that he was aware of the passage in *Adair* regarding indirect injury when he was deciding whether to file the 2013 State Court Case. But then, in the Sanders Objection, he represents that he was not aware of that aspect of the case until long after he filed the 2013 State Court Case—that he did not, in fact, become aware of it until after this litigation in the bankruptcy court ensued. The Court thus cannot conclude that Sanders was acting in good faith when he commenced and continued the 2013 State Court Case.

In addition to adopting the other Objectors' arguments, the Co-administrators make several of their own. First, they argue that the $250,000 that TCO paid to Ransier to settle any claims that NGP had against the Columbia Gas Entities (including the NGP Ohio RICO Claims) was property of NGP's bankruptcy estate, but that the NGP Ohio RICO Claims themselves were not property of the estate. Co-administrators Objection at 1–3. The Court has already considered and rejected this argument. *See Contempt Op.*, 519 B.R. at 741–54. Second, the Co-administrators contend that "the ownership of the [NGP Ohio RICO Claims] is something on which there can be honest disagreement." Co-administrators Objection at 3. To the contrary, as the Court previously held, the contention that Fulson owned the NGP Ohio RICO Claims defies logic, common sense and applicable case law. *See Contempt Op.*, 519 B.R. at 745–54. The Court likewise rejects the Co-administrators' attempt to characterize their contemptuous conduct as an "honest, good faith assertion of claims." Co-administrators Objection at 3. And even if the Objectors had been operating in good faith, "a [g]ood faith [belief] is not a defense in civil contempt proceedings." *Contempt Op.*, 519 B.R. at 754 (internal quotation marks omitted).

Finally, the Co-administrators argue that Ransier will be unable to recover on any claim he has against the Fulson Estate because Ransier did not timely assert the claim in the probate proceeding. *See* Co-administrators Objection at 3. But the timeliness of Ransier's claim is an issue for the probate court. Furthermore, the possibility that Ransier might be unable to recover on the claim provides no reason for this Court to decline to enter an order against the Fulson Estate.

## VI. Conclusion

To compensate the NGP bankruptcy estate for the damages it sustained as a

result of the contempt of the Fulson Parties, the Court hereby enters judgment in favor of Ransier and against Sanders, Lowe and the Fulson Estate, jointly and severally, in the amount of $91,068.

**IT IS SO ORDERED.**

